**COLBY et al. v. RIGGS NAT. BANK.**

**WEHNER et al. v. SAME.**

Nos. 6750, 6751.

United States Court of Appeals for the
District of Columbia.

Argued Jan. 11, 1937.

Decided May 31, 1937.

184

Marcus Borchardt, Fred B. Rhodes, and Cooper B. Rhodes, all of Washington, D. C., for appellants in No. 6750.

Benjamin S. Minor and Arthur P. Drury, both of Washington, D. C., for appellants in No. 6751.

Frank J. Hogan, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, J.

Appellants brought their bills in the United States District Court seeking to recover from the Riggs National Bank of Washington city some $800,000 claimed to belong to them and others in like situation and to have been misappropriated by Swartzell, Rheem & Hensey Company.

Forty other persons intervened and became parties plaintiff. A concise statement of facts follows:

Swartzell, Rheem & Hensey Company, called Swartzell Company, had conducted for nearly half a century a note brokerage business in the District of Columbia. Its reputation and standing were of the highest, and its satisfied clients were to be found in all parts of the United States. Rheem was its controlling head. In 1928 it acquired and sold to its customers a note issue aggregating two and a quarter million dollars secured by first deed of trust on the Shoreham Building, a valuable business property located in the heart of Washington. Luther A. Swartzell and Edmund D. Rheem personally were appointed trustees. The deed contained this provision: "And upon the full payment of all of said notes and of all extensions or renewals thereof, and the interest thereon, or upon prepayment thereof with interest and advance interest thereon as therein provided, and of all moneys advanced or expended as herein provided * * * to release and reconvey the said described premises in fee unto, and at the cost of, the said Harry Wardman and Thomas P. Bones, as joint tenants, or the party or parties then claiming under them. And it is mutually covenanted and agreed by and between the respective parties hereto that the said full payment of principal and inter--

est * * * at the office of Swartzell, Rheem and Hensey Company in the City of Washington, District of Columbia, shall constitute payment of said notes respectively and shall stop interest thereon from date of said payment at said office, and (all other matters having been fully paid as herein provided) the said parties hereto of the second part, or the trustee acting in the execution of this trust, shall thereupon have power to release and reconvey said land and premises, as aforesaid, without the presentation or cancellation of said notes or any of them." Some time after it had disposed of the notes, Swartzell Company acquired title to the property in the names of two of its employees, and in 1930 it arranged to sell it free and discharged of liens for part cash and the delivery of another business building in Washington. On July 16, 1930, the purchaser was ready to settle but, as a condition to the payment of the money and the transfer of the other property, insisted that Swartzell Company and Swartzell and Rheem, the trustees under the trust, deposit in bank a sufficient sum of money to pay in full with interest the total outstanding note issue and that this deposit be "earmarked" for the account of the noteholders secured in the deed of trust. The sum of money necessary for this purpose was $2,334,750. The amount of cash which the purchaser was to pay amounted to only $1,706,645.80, and in order to comply with the buyer's demand, Rheem, as the representative of Swartzell Company, on the morning of July 16, solicited a five-day loan of $625,000 from the Riggs National Bank, offering to secure the loan by the deposit of collateral of the value of $859,000. Rheem told Mr. Fleming, the president of the Bank, that he had made an advantageous sale of the Shoreham Building but that in order to comply with the purchaser's demands he needed the money temporarily, and requested Fleming to approve the loan "pending the settlement of the transaction." Fleming consented, provided the loan was secured as already mentioned, but in order to bring the loan within the technical provisions of the banking laws it was agreed that it would be made in the form of two promissory notes, one signed by Swartzell Company for $380,000 and the other by Swartzell and Rheem, trustees, for $255,000, each payable five days after date with interest at 6 per cent. (the amount of the loan was later increased $10,000 at Rheem's

request). Fleming then turned over the carrying out of the details to Mr. Nevius, one of the vice presidents of the Bank.

In the afternoon of the same day Rheem and a representative of the purchaser went to the Bank to close the transaction. The purchaser's representative stated to Nevius that he had been instructed not to pay over the cash purchase price of the property until assured by the Bank that the total sum necessary to pay the noteholders in full, with interest, had been deposited in the Bank to the credit of Swartzell and Rheem, trustees, and Swartzell Company, for the account of the noteholders. Thereupon the Bank delivered its checks for $635,000, and this amount, together with the purchase-money cash, was deposited in the Riggs Bank and a certificate issued by the Bank to the representative of the purchaser in the following words:

"This is to advise that there is on deposit to the credit of Swartzell, Rheem and Hensey Co., and Luther A. Swartzell and Edmund D. Rheem, Trustees under Deed of Trust dated August 1, 1928, and recorded in Liber 6194, folio 347 of D. C. Land Records, for account of holders of notes described in said trust in the sum of $2,334,750."

Swartzell and Rheem, as trustees, thereupon executed, as the deed of trust authorized, a release deed completely discharging the trust securing the notes. On the same day and shortly after the bank closing hour Fleming, who was absent at the time the loan and deposit were made, returned to the bank and was apprised by Nevius of all that had occurred. He was disturbed on reading the certificate which the bank had issued, and immediately wrote the representative of the purchaser: "I desire to confirm my statement [telephone conversation] to the effect that in issuing our letter, we did so without any obligation on our part to look to the application of the money deposited in the payment of the first deed of trust notes * * *." This letter, and another to the manager of the local title company, he caused to be sent by hand, so that delivery would be made at once. And upon receiving satisfactory replies he put the matter out of his mind.

However, it also appears that in addition to the two and a quarter million dollar first trust on the Shoreham Building, Swartzell Company during its ownership had placed on it a second trust to the

amount of $300,000, and had used this trust note as security for a loan of $255,000 from Southern Dairies, Inc. Swartzell Company had agreed with the purchaser of the Shoreham Building also to release the second trust prior to completion of the sale. The note had been deposited in Riggs Bank for collection, and in order to fulfill the agreement in this regard Rheem went to the Bank some time in the afternoon of the 16th with his company's check for $262,947.49. The balance to Swartzell Company's general deposit account with the Bank then amounted to only $86,907.50, but the Bank teller, acting by direction of Nevius, accepted the check and delivered the note with the result that Swartzell Company's account was overdrawn to the extent of $176,039.99 (later that day increased about $2,000 by the payment by the Bank of other outstanding checks). Nevius, when he authorized the teller, without reference to the bookkeeper, to accept Swartzell Company's check, did not know that the payment of the check would create an overdraft, but late that same afternoon he was informed by the head bookkeeper of the fact and reported it to Fleming. Both Fleming and Nevius agreed it was then too late to do anything about the matter that day, and the following morning, viz., July 17, Swartzell and Rheem, as trustees, and Swartzell Company jointly drew a check payable to Swartzell Company for $2,334,750, the whole amount of the trust deposit; and this check indorsed by Swartzell Company was deposited around eleven o'clock of July 17 to the personal account of Swartzell Company—the effect of which, as now appears, was to pay and cancel the overdraft. And a little later that same day Swartzell Company delivered to Riggs Bank its check for $635,000 with one day's interest, to pay the loan to it made the previous day.

This suit, instituted by holders of Shoreham notes to the aggregate amount of approximately $685,000,[1] is to establish their right as against the Riggs Bank to the sum of $819,296.34—the total of the overdraft paid as we have seen, and the check to the Bank in payment of the notes. The grounds of the suit are that the Bank accepted payment of the overdraft and of the notes with knowledge that the money used therefor was a trust fund of the noteholders and that its diversion by Swartzell Company in payment to the Bank of its

personal indebtedness was unlawful; and it is therefore recoverable.

First. If the decision turned upon the application of the common-law rule of liability, we should have no difficulty in reaching the conclusion that the Bank was answerable to the noteholders for the payments received from Swartzell Company on account of the overdraft and the loan; for by the great weight of authority these payments to the Bank, in the circumstances we have narrated, were clearly invalid. This conclusion—based on the following propositions—follows, we think, notwithstanding the Bank may have had no actual knowledge of the diversion of the trust fund but only constructive or imputed knowledge.

A. The Bank admittedly had actual knowledge of the trust character of the original deposit;

B. The transfer of that deposit from the trustee account to the personal account did not affect its fiduciary character, Central National Bank v. Insurance Co., 104 U.S. 54, at page 66, 26 L.Ed. 693;

C. The check by which this transfer was effected showed on its face that it was jointly drawn by Swartzell and Rheem, trustees, and Swartzell Company on a trust account, for deposit to Swartzell Company's personal account;

D. The Bank had knowledge that at this time the personal account was overdrawn;

E. The form of the check making the transfer put the Bank on notice of the nature of the transaction—that is to say, on notice, not that the transfer was unlawful, but that the fund making up the personal account, after the transfer, was still a fiduciary fund, and that that account then consisted of nothing but fiduciary funds;

F. A Bank having notice, either actual or implied, that a fund is impressed with a trust cannot receive from that fund money in payment of the fiduciary's indebtedness to it, for to do so is to establish by such acceptance proof of the breach of trust and of its participation therein to its own benefit, Union Stock-Yards Nat. Bank v. Gillespie, 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724; Rodgers v. Bankers National Bank, 179 Minn. 197, 229 N.W. 90; Allen v. Puritan Trust Co., 211 Mass. 409, 97 N.E. 916, L.R.A.1915C, 518; United States v. Butter-

---

[1] The balance of the noteholders received money, or its equivalent.

worth-Judson Corp.; 267 U.S. 387, 45 S.Ct. 338, 69 L.Ed. 672; Bank of Giles County v. Fidelity & D. Co. of Maryland (C.C.A.) 84 F.(2d) 321; Dickens v. Howard (C.C.A.) 67 F.(2d) 263.

■ Thus, when the Bank first paid itself the overdraft out of the deposit created by transfer of the trust fund and accepted repayment of the loan out of that fund, it was chargeable with constructive notice of its receipt of trust funds in payment of a private debt. This is so because the check by which the transfer was made and which the agents of the Bank accepted for deposit to the trustees' personal account proclaimed on its face that it was drawn on a trust account, and this alone was enough to put the Bank on inquiry. The Bank, in these circumstances, having actual knowledge that the debt was a private debt and constructive or imputed knowledge that the payment of the debt was made by the use of trust funds, was liable if there was in fact a misappropriation of the funds. This is the rule laid down in Central National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; Union Stock-Yards Nat. Bank v. Gillespie, 137 U.S. 411, 11 S. Ct. 118, 34 L.Ed. 724; Foxton v. Manchester and Liverpool D. B. Co., 44 Law Times (N.S.) 406 [1881]; Allen v. Puritan Trust Co., 211 Mass. 409, 97 N.E. 916, L.R. A.1915C, 518; Rodgers v. Bankers Nat. Bank, 179 Minn. 197, 229 N.W. 90; Keeney v. Bank of Italy, 33 Cal.App. 515, 165 P. 735; Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A.1916F, 1059; Boyle v. Vivian State Bank, 55 S.D. 441, 226 N.W. 579; Foss v. Hume, 130 Me. 22, 153 A. 181; Hale v. Windsor Bank, 90 Vt. 487, 98 A. 993; W. L. Chase & Co., Inc. v. Norfolk National Bank of Commerce Trusts, 151 Va. 1040, 145 S.E. 725.

*Second.* And this brings us to the question whether the Uniform Fiduciaries Act, which is in effect in the District of Columbia,[2] changes the rule.

The act was passed in 1928, and the relevant parts of the reports of the House and Senate Committees are copied in the footnote.[3] The purpose of the bill is de-

---

[2] 45 Stat. 509 (D.C.Code 1929, T. 11, § 31 et seq.).

[3] The bill was introduced at the request of the Bar Association of the District of Columbia. At the hearings before your committee, it was considered section by section and its passage was advocated by representatives of the Bar Association of the District, of the American Bar Association, of the National Conference of Commissioners on Uniform State Laws, of the Clearing House Association of the District of Columbia, of the American Bankers Association, and of the District of Columbia Bankers Association. No opposition to the passage of the bill has been made known to the committee.

The several sections of the bill subsequent to the enacting clause are in the precise form drafted to be pressed for enactment in all the States and Territories. The purpose of the bill is to establish uniform and definite rules in the place of the diverse and indefinite rules now prevailing as to "constructive notice" of breaches of fiduciary obligations. Liabilities of fiduciaries are not dealt with nor affected, but only the liabilities of persons dealing with fiduciaries. At present the law in the several States as to the liability of persons dealing with fiduciaries is uncertain. It is not clear under what circumstances such persons are charged with "constructive notice" of breaches of trust by fidu-

ciaries. The usual result if a third person dealing with a fiduciary is charged with constructive notice of a breach of trust by a fiduciary, is that the person so dealing is held liable along with the fiduciary for the breach of trust.

Much of the proposed act is merely declaratory of existing law as established in many jurisdictions. Which of the diverse rules established in the several States would be followed in the District of Columbia if this branch of the law were left to judicial development, can not with certainty be stated; but some of the decisions in the States set up as a test of the liability of a person dealing with a fiduciary, such as the payee or indorsee of a check drawn or indorsed by a fiduciary, the question whether such person was negligent. The proposed act makes such a person liable only if he takes the negotiable instrument with knowledge of such facts as makes his action amount to bad faith.

Sections 4, 5, and 6 [D.C.Code 1929, T. 11, §§ 34–36] deal with holders of negotiable paper drawn or indorsed by fiduciaries. These are the sections which are supplemental to and consistent with section 76 of the negotiable instruments act (D.C.Code, § 1360 [D.C.Code 1929, T. 22, § 76]), and deal with the question whether such holders get good title to the instrument or are liable for using the proceeds of it if in fact the fiduciary has committed a breach of his trust. Under

clared to be to establish uniform and definite rules in the place of the diverse and indefinite rules then prevailing as to "constructive notice" of breaches of fiduciary obligations and to remove present unwise and undesirable burdens imposed by court decision on those dealing with fiduciaries. The reports say that the present law as to the liability of persons dealing with fiduciaries is uncertain, and the act is recommended for passage in the realization that the need for clarification on the one hand, and the removal of these burdens on the other, is desirable.

Fourteen or fifteen States have in the past few years put the new law into effect, but the cases since enactment, particularly in relation to the inquiry here, are not particularly helpful. Considered in its entirety, it is manifest that the effect of the act is to enlarge the ability of fiduciaries to avoid the limitations imposed by the common law, although the liabilities of the fiduciaries as such are not affected, but only those of persons dealing with them.

The act is copied in the margin.[4]

The first section (D.C.Code 1929, T. 11, § 31) is confined to definitions, and the

---

sections 4 and 5 the liability of such a holder is made definite if he acted in bad faith, or if he took the instrument in payment or in security for a personal debt of the fiduciary, or in a transaction known to be for the personal benefit of the fiduciary. The distinction between cases covered by sections 4 and 5 and that covered by section 6 is in accordance with Massachusetts cases cited in review of the subject in 34 Harvard Law Review 454, note 26.

Sections 7, 8, and 9 [D.C.Code 1929, T. 11, §§ 37–39] deal with the liabilities of banks and other depositaries of fiduciary funds. In the several different cases dealt with in these sections, liability of the bank is declared where the bank has knowledge of such facts as amounted to bad faith or knowledge that the fiduciary was committing a breach of his obligation, or in the case of deposits in the name of the principal or in the name of the fiduciary as such, where the check in question is payable to the bank itself and in payment or security for a personal debt of the fiduciary. (House Report No. 875, 70th Cong., 1st Sess.)

Senate Report No. 763, 70th Cong., 1st Session,—to accompany H.R. 6844—is substantially in the same language. The purpose of the act, the report states, "is to establish uniform and definite rules in the place of the diverse and indefinite rules now prevailing as to 'constructive notice' of breaches of fiduciary obligations," etc.

4 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following provisions concerning liability for participation in breaches of fiduciary obligations, and to make uniform the law with reference thereto, shall be in force in the District of Columbia, namely:

Section 1. Definition of terms.—(1) In this Act [chapter] unless the context or subject matter otherwise requires:

"Bank" includes any person or association of persons, whether incorporated or not, carrying on the business of banking.

"Fiduciary" includes a trustee under any trust, express, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust, or estate.

"Person" includes a corporation, partnership, or other association, or two or more persons having a joint or common interest.

"Principal" includes any person to whom a fiduciary as such owes an obligation.

(2) A thing is done "in good faith" within the meaning of this Act [chapter], when it is in fact done honestly, whether it be done negligently or not. * * *

Sec. 4. Transfer of negotiable instruments by fiduciary.—If any negotiable inment payable or indorsed to a fiduciary as such is indorsed by the fiduciary, or if any negotiable instrument payable or indorsed to his principal is indorsed by a fiduciary empowered to indorse such instrument on behalf of his principal, the indorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in indorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit

feature of these of importance is that an act done in "good faith" is declared to be—*an act done honestly whether done negligently or not.* Sections 2 and 3 (D.C.Code 1929, T. 11, §§ 32, 33) relate to transactions involving transfer to the fiduciary of money or property and the registration or transfer of shares of stock held by the fiduciary as such. They may be put to one side.

Section 4 (D.C.Code 1929, T. 11, § 34) provides that the transferee of a negotiable instrument payable to or indorsed to and by the fiduciary—as such—is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in indorsing or delivering the instrument, and without actual knowledge is not chargeable with notice, etc. The section, however, contains the proviso that if the instrument is transferred by the fiduciary in payment of a personal debt, the creditor is liable if the fiduciary in fact commits a breach of his obligation.

The language of section 5 (D.C.Code 1929, T. 11, § 35) is identical except that it relates to fiduciary checks. Just as in section 4 the indorsee of a negotiable instrument indorsed by the fiduciary *as such* is not bound to inquire, so in section 5 the taker or payee of *a fiduciary check,* without actual knowledge of a breach of the fiduciary obligation, may receive the check without liability—unless the check is in payment of a personal debt of the fiduciary.

Section 6 (D.C.Code 1929, T. 11, § 36) marks a material departure from established law. By its terms a fiduciary may draw a check to his own order or he may draw a check payable to a third person, and in the first instance by indorsing the check over to another and in the second by having the payee indorse the check back to the fiduciary, he may pass it either in payment of his own debt or otherwise without liability to the taker,—unless the taker has actual knowledge of a misappropriation or knowledge of such facts as make the taking amount to bad faith. Thus by the simple device of making the fiduciary check payable to himself personally and indorsing it over to his personal creditor, the liability of the creditor may be easily avoided. But that this change was made deliberately sufficiently appears, as we shall point out later.

---

of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in transferring the instrument.

Sec. 5. Check drawn by fiduciary payable to third person.—If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.

Sec. 6. Check drawn by and payable to fiduciary.—If a check or other bill of exchange is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, payable to the fiduciary personally, or payable to a third person and by him transferred to the fiduciary, and is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith.

Sec. 7. Deposit in name of fiduciary as such.—If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with

Apparently the draftsmen of the act intended 4, 5, and 6 to cover transactions involving only transfer of negotiable instruments payable to the fiduciary *as such* and acceptance of fiduciary checks *as such.* 7 and 8 (D.C.Code 1929, T. 11, §§ 37, 38), on the other hand, cover the liability of depositary banks in the payment of checks, drawn by the fiduciary *as such,* and section 9 (D.C.Code 1929, T. 11, § 39), checks drawn by the fiduciary *personally* on fiduciary funds deposited in his personal account.

Section **7** relieves the depositary bank, except with actual knowledge that the fiduciary is committing a misappropriation, of liability for the payment of a check drawn by a fiduciary as such—except where the check is payable to the drawee bank and is delivered to the bank in payment of a personal debt of the fiduciary. Section 8 is identical, except that it covers the case of a check drawn upon the account of a principal by an agent empowered to draw checks on the principal's account.

Section 9, which the Bank insists relieves it of liability on the payment of the notes, is as follows:

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, * * * or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith."

■ The facts in the instant case show that in order to carry through the sale of the Shoreham Building, Swartzell Company, as agent of the noteholders under the Shoreham Building trust, and Swartzell and Rheem, as trustees under the trust, established an account in their joint names in the Riggs Bank. This was a fiduciary

knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.

Sec. 8. Deposit in name of principal.— If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account, the bank is authorized to pay such checks without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check.

Sec. 9. Deposit in fiduciary's personal account.—If a fiduciary makes a deposit in a bank to his personal credit of checks

drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith. * * *

Sec. 12. Cases not provided for in act [chapter].—In any case not provided for in this Act [chapter] the rules of law and equity, including the law merchant and those rules of law and equity relating to trusts, agency, negotiable instruments, and banking, shall continue to apply.

account. The following day they jointly drew a check payable to the order of Swartzell Company for the whole of the trust fund and redeposited the amount withdrawn to the personal account of the company. This is exactly the sort of transaction contemplated in the first part. of section 9, and in such case the Bank by that section is expressly relieved of the obligation to inquire whether the fiduciary in the transfer of the fund committed a breach of his obligation. The Bank may accept the transfer unless it acts with bad faith, or has actual knowledge of misappropriation. Obviously, therefore, so far no liability arose. And this brings us then to inquire, whether the remaining language of the section may be construed to carry this exemption to a case of payment by the fiduciary of his personal debt to the bank by personal check drawn on his personal account to which, as we have seen, the fiduciary funds had been transferred. The language of the section continues—"and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary." Unquestionably this latter language is intended to authorize the bank, without liability, to honor at least checks thus drawn in favor of third persons. But does it also authorize the bank to *receive* such a check in payment of a debt of the fiduciary to it?

The question is new, and so far as we are able to determine is not referred to in any of the law magazine articles in which the act is examined and discussed.[5]

As we have noticed, sections 7 and 8, which deal with the check of the fiduciary *as such,* definitely provide that where the check is payable to the drawee bank and delivered in payment of a debt of the fiduciary to the bank, the bank accepts it at its peril; and in this respect the position of the bank is identical with the position of an individual payee under section 5. And the reason of this is that the check, either in the hands of the individual or the bank, carries on its face notice of its fiduciary character or—as was said in a Washington State case, "bears its death wound upon its face." But in cases under section 9 the check is regular on its face and carries to the payee no notice of infirmity. So far as the face of the check is concerned, it is a personal check drawn on personal funds. And so it is strongly urged by the Bank that, in this absence of sign or symbol indicating the fiduciary character of the check, the payee, whether the Bank or a third person, is relieved and was intended to be relieved by the terms of the act of any obligation to trace to its source the fund from which it is payable—and this, because such an obligation imposes an overburdensome restriction on banking and tends to clog the wheels of commerce. And so the Bank insists that it is manifest that the purpose of the draftsmen of the act was to exempt the payee bank from liability in every case in which it received the *personal check* of one indebted to it in payment of his debt unless, of course, the bank had *actual knowledge* that the maker of the check was guilty of a misappropriation or itself acted with bad faith.

We think there is force in the argument, and it is strengthened by the inclusion in 7 and 8 of a specific provision making the bank liable where it receives *a fiduciary check* in payment of a personal debt of the fiduciary to it and its omission in 9, where in the same circumstances it accepts a personal check. Obviously there was a purpose to classify the two transactions differently. On the other hand, the language leaves much to be desired. As we have seen, "the bank is authorized *to pay* the amount of the deposit," and this suggests the query: Are the words "to pay" synonymous with "to receive"? While the phrase "to pay" in ordinary parlance may seem to connote only payment to a third party, as a matter of law the bank does "pay" a check drawn on it in its own favor, that is to say, it charges the same against the account of the depositor and causes that check to augment the bank's own funds. Considering the three sections, 7, 8, and 9, together (and it is clear they were intended to be considered together and to create an harmonious rule applicable to bank liability), we find in all three the same words. That is to say, in 7 and in 8 the bank is authorized *to pay* the amount of the trust deposit upon the check of the fiduciary without liability *unless "such a check" is payable to itself.* Considered as a single section or as three sections written in correlation to one another, the words "to pay" in 7 and 8 were evidently regarded by the Commissioners on Uni-

5 81 Univ. of Pa.Law Rev. 863; 16 Va.Law Rev. 401; 24 Col.Law Rev. 661.

form State Laws in the broad sense of, to pay to anybody, including the drawee bank, and therefore as necessitating the *qualify-ing* exception in 7 and 8 as to payment to the bank; and it is reasonable to assume that in using the same language without the qualifying exception in 9 they intended to apply the same broad meaning. But if this is not convincing, then it is obvious that the words "to pay" are ambiguous in the latent sense, that is to say, as to their application to a check drawn in favor of the bank as well as upon it. In this view the act must be construed, and to that end we may have recourse to the reports of the Committees of Congress and to the notes of the Commissioners.

Both the Senate and House Reports show very clearly that it was the intention to make the bank liable in any case in which it accepted the check of the fiduciary *as such* in payment of his personal debt, but to make the bank immune from liability in a case in which it accepted the *per-sonal check* of the fiduciary, except where it acted in bad faith or had knowledge that the fiduciary was committing a breach.

The same conclusion follows in looking to the Commissioners' notes. They say:

"By the weight of authority a depository of fiduciary funds is not bound to inquire into the authority of the fiduciary to make the deposit even where the deposit is made in the personal account of the fiduciary.

"And when the fiduciary makes withdrawals by check the depository is not bound to inquire for what purpose the withdrawals are made, whether the checks are made payable to the fiduciary personally, or as fiduciary, or to third persons.

"But when the check is payable to the depository bank and delivered in payment of or as security for a personal debt of the fiduciary, the bank is put upon inquiry.

"There are, however, certain exceptions to or limitations upon these principles which it is the purpose of these sections to abolish."

The report then undertakes by illustrative cases to indicate precisely what are the limitations and exceptions it is intended to abolish, viz.:

"1. * * *
"2. * * *
"3. * * *
"4. * * *
"5. Where the fiduciary makes a deposit in his personal account and subsequently pays a personal debt to the bank by a check on that account, the bank is bound to inquire how far the payment is made out of trust funds; in other words it must ascertain the amount of the (a) trust funds deposited, (b) personal funds deposited, (c) trust funds withdrawn, and (d) personal funds withdrawn. This means that the bank must ascertain what is done with all funds withdrawn from the bank."

The case stated by the Commissioners in paragraph 5 is analogous to the case at hand unless a difference may be found in the accidental fact that at the particular moment of the transfer of the fiduciary fund to the personal account, the latter was overdrawn; but we think this fact does not affect the principle or destroy the appropriateness of the illustration as indicating the purpose which the Legislature had in mind.

And in conclusion and by way of summary, the Commissioners say:

"6. * * *

"The purpose of sections 7, 8 and 9 is to lay down a definite rule, making the bank, where it acts solely as a depository, liable only if it has actual knowledge of the fiduciary's breach of duty or if it acts in bad faith; and where the bank acts as creditor, making it liable to the same extent as other creditors are made liable."

From all of this it is manifest that the draftsmen of the act intended to substitute a new and different standard of liability in a case like that in illustration 5. If then the purpose was accomplished, that is to say, if the language of the act goes so far, the question of liability of the Bank in relation to the acceptance of the check in payment of the notes (putting to one side for the moment the question of actual knowledge or good faith) must be answered in its favor, for the facts in its case, as we have said, fairly parallel those stated in the illustration. There, as here, the fiduciary makes a deposit of fiduciary funds in his personal account and there, as here, draws his personal check in payment of a personal indebtedness to the bank. The Commissioners say that in such a case the bank by decisions in some of the states was bound to know the exact nature of the account and hence how far the payment was made out of trust funds and so to accept payment at its risk and peril. But this, they say, in view of the complexity of modern banking, is an unreasonable

condition, and they purpose in section 9 to abolish it. Obviously, if section 9 can be construed as going to the extent the Commissioners supposed, there is nothing left to this aspect of the case.

But, looking again at the Commissioners' notes, we find in the concluding summary what they say is the purpose of the three companion sections 7, 8, and 9, viz., to make the bank liable where it acts *solely* as depositary, only if it has actual knowledge of the fiduciary's fraud or acts in bad faith; and, where it also acts as creditor, as is the case here, to make it liable to the same extent as other creditors are made liable. That is to say, to place its liability on a parity with other creditors of the fiduciary who accept his *personal* checks in payment of his personal debts.

And this brings us to inquire what is this creditor liability. To answer this, it would seem proper to look at sections 4, 5, and 6—which relate to creditors generally. Sections 4 and 5 are not helpful, because they relate to fiduciary's checks, but section 6 affords a parallelism that—by analogy—seems to fit. There it is expressly provided that where the fiduciary draws his fiduciary check payable to himself personally and thereafter indorses it over to his creditor, the creditor may—actual knowledge and bad faith out of the way—accept it without liability. In other words, the "death wound upon its face" is made innocuous by the intervention of a new interest—even where the interest is the fiduciary himself. We have said in discussing 6 in the early part of this opinion that this radical change in the established law was deliberate, and we rely for this on the Congressional Committee Reports, where it is said that the distinction between cases covered by 4 and 5 and that covered by 6 is in accordance with Massachusetts cases cited in a review of the subject in 34 Harvard Law Rev., 454, note 26. The cases referred to are Fillebrown v. Hayward, 190 Mass. 472, 77 N.E. 45, and Johnson & Kettell Co. v. Longley Luncheon Co., 207 Mass. 52, 92 N.E. 1035, 1037. Those cases involved negotiable instruments. In the last mentioned the reason of the rule (i. e., the rule carried into the new act by section 6) is stated thus:

"The distinction seems to be this: Where the corporation note or other negotiable instrument is payable to the creditor of the individual [treasurer], the transaction which on the face of the note or other instrument is represented to have taken place is an appropriation of the corporation's money to the payment of the individual's debts and is bad unless shown to be good. Since the transaction is bad unless shown to be good and since the purchaser took with notice (given on the face of the note or other instrument), his rights depend upon the transaction's being or not being in fact what it purports on the face of the note or instrument to be, and no question of a purchase in good faith can arise. * * * But on the other hand where the note or other instrument is payable to the treasurer [or fiduciary] or to a third person, and after being indorsed by the payee in blank is used by the treasurer [or fiduciary] in paying his individual debt, the transaction which on the face of the instrument is represented to have taken place is a payment by the corporation to the treasurer (where the note or other instrument was payable to him) and a payment by the corporation to the third person and another payment by the third person to the treasurer (where the note or other instrument was payable to a third person as stated above). In each of these last two cases the transaction [on its face] is good unless it is proved to be bad. In that case, if the corporation proves that the application of the note or other instrument of the corporation was a wrongful one, the rights of the creditor depend upon his having acted in good faith."

And so Congress has provided in 6 that an individual creditor may accept payment of a personal debt by check on funds which he knows were at one time impressed with a trust provided the check has passed through the ostensible ownership of the trustee or of a third party. The reason given is that this ownership of the trustee personally or of the third party may very well be proper, and the creditor ought not to be required to investigate and ascertain the fact. And so the similarity of which we spoke between 6 and 9 is thus apparent. Under both there is a payee who knows the money comes originally from a trust estate (for in 6 the check on its face discloses this fact, just as in 9 the fiduciary check deposited in the personal account shows it). The money—represented by the check—in either case has passed through the ostensible ownership of the fiduciary, and in either the creditor is not required to inquire whether the claim of ownership is or is not valid.

In adopting this view of the effect of the Fiduciaries Act, we are brought to conclude that the check given by Swartzell Company to the Bank in payment of the loan was regular and the amount not recoverable unless the Bank received the check with "actual knowledge" of a breach of the fiduciary obligation or with knowledge of such facts that its action in paying the check amounts to bad faith.

In Union Bank & Trust Co. v. Girard Trust Co., 307 Pa. 488, 161 A. 865, 867, the Supreme Court of Pennsylvania, construed the expression, "actual knowledge of breach of his obligation as fiduciary"— to be the equivalent of—misappropriation. Thus wherever the words appear in the act they are to be read to mean, actual knowledge of misappropriation; and we think the other expression, acts done with knowledge of such facts as amount to bad faith, means, as indicated by subsection (2) of section 1, acts done dishonestly.

We are of opinion that the use by Swartzell Company of a part of the trust funds was a misappropriation; for we take the word "misappropriation" to mean wrong appropriation, or the use of a fund to a different purpose from that for which it was created; but not necessarily a dishonest purpose. Considered in this light, the use of the noteholders' fund to the payment of the notes of Swartzell Company, in the circumstances we have shown, was a misappropriation. And this, then, brings us to the question: Did the Bank have "actual knowledge" that the payments were made out of this fund?

We have shown that in the reports of the House and Senate Committees it appears that the purpose of the bill was to establish uniform and definite rules in the place of the diverse and indefinite rules formerly prevailing as to constructive notice of breaches of fiduciary obligations. In view of this it is obvious that in the use of the words "actual knowledge" Congress meant to change the rule previously applied in many courts, of constructive or implied or imputed knowledge, and we think there can be no doubt that there is a marked distinction between actual knowledge and constructive or implied knowledge. The former consists in express information of a fact. The latter is in the nature of a legal inference. A common illustration is that if a person reads a deed or contract, by that fact he has actual knowledge of its contents. If, on the other hand, he has never seen or read the paper but it is of public record, he is presumed to have knowledge of its contents. In the one instance he actually knows the contents; in the other he may not and yet be charged with all the consequences flowing from such knowledge.

If at the time of the acceptance of the check in payment of the notes the Bank had actual knowledge that the money for this purpose was the fund which the day before it had certified it held for the account of the noteholders, it would in our view be answerable for the misappropriation. But the Bank says that it had no actual knowledge, and the lower court has found as a fact (23) that:

"No officer or employee of the Bank had any connection with, or knowledge of, the receipt of that deposit [deposit to the general account of Swartzell Company] at the time it was made excepting the paying and receiving teller who received the same from a representative of the Company."

An examination of the evidence shows that the only testimony received on the subject of the Bank's knowledge of the transfer of the fund was given by the witness Handy, for the noteholders, and by the witness Nevius, for the Bank. Handy's testimony is that after the deposit was made around 11 o'clock on the morning of the 17th he was sent to the Bank by Mr. Rheem with the passbook to have the deposit entered. On his arrival at the Bank he handed the passbook to Mr. Nevius and told him that he had been requested by Mr. Rheem to bring it over and have "a deposit" entered in the book, and that Nevius took the passbook to the window of one of the tellers, the deposit was entered, and the book handed back to him. Nevius testified that he had no recollection of Handy's bringing the passbook to the Bank; that such an occurrence is not unusual and when it happens the passbook is sent to the bookkeeping department of the Bank to get the correct amount and date of the deposit as shown by the ledger. He also testified that he did not see the check transferring the fund from the trust account to the Swartzell Company account at any time until the question arose as the result of this or other litigation, and also that he had nothing to do with the payment of the notes by the check for $635,000 and was not informed that the notes had been paid until later in the same day when he

was asked whether the deposited collateral should be redelivered. The evidence as to the deposit itself is that it was made around eleven o'clock in the day by the delivery to the teller, probably by Rheem, of a deposit slip and duplicate slip and the $2,000,000 check properly indorsed in blank. If the deposit had been a normal banking transaction—one of thousands of items passing through the Bank daily—it would be going very far to attach significance to the event, but here was a two million dollar transaction which it is not so easy to characterize as routine. But, as we have seen, the lower court saw the witnesses and heard them testify and has found that the only person in the Bank who had any knowledge of the transfer was the teller of the Bank. In these circumstances, it would be going very far to say that the Bank knew when it accepted payment of the notes, a few hours later, it was being paid out of the trust money; and in this view we are of opinion we must apply the universal rule that, where the lower court has heard the witnesses and considered the evidence and made its findings, they must be taken as presumptively correct unless in the case of an obvious error or where wholly unsupported.

To hold that the Bank had actual knowledge as the result of the knowledge of the teller would, we think, be contrary to the terms and to the spirit of the Fiduciaries Act. The knowledge of the teller was confined to the fact of transfer from the one account to the other. He had no knowledge of the overdraft or of the purpose of Swartzell Company later to pay out of this transferred fund the debt to the Bank. The transfer of the fund from the one account to the other was neither an unusual nor an unlawful act. It is one of the things which are specifically permitted under the act and were almost universally recognized as valid and permissible under the majority of the decisions made prior to the passage of the act. To this, there should be added the fact that the payment over of the fund to Swartzell Company was, as we held in the Rhoderick Case (Rhoderick v. Swartzell, 62 App.D. C. 180, 65 F.(2d) 813), entirely proper. Swartzell Company had been appointed under a provision of the deed of trust securing the notes, agent for the noteholders to receive payment and disburse the fund so received to the noteholders as their interest should appear. There was certainly nothing in the transaction, therefore, to put the teller on notice of a wrong, and equally nothing either in the fact itself or in the custom of business to impose upon him the duty of reporting the deposit to the executive officers of the Bank. In Scott, Participation in a Breach of Trust (1921) 34 Harv.L.Rev. 454, 480 (an article which the Commissioners, as is shown by their report, had before them in drafting the law), it is said:

"It must be remembered also that practically all the clues are not known to any one employee of the bank, and that the facts known to any one employee are not sufficient to arouse suspicion. It must be remembered that the processes of receiving deposits and paying checks are processes in which many employees of the bank take each his separate part. If no one of the employees has knowledge of any breach of trust the bank should not be held liable merely because it appears that at some stage by piecing together all the facts known to different employees a breach of trust would become more or less apparent. The bank is in no way to blame for receiving deposits or allowing withdrawals merely because all the facts known to several employees would, if known to one employee, have aroused a suspicion of misconduct by the depositor. The bank, it is submitted, should not be liable unless some officer or employee has actual knowledge of the depositor's misconduct or knowledge of facts so clearly indicating such misconduct as to show that the bank was guilty of bad faith."

And this brings us to the next question: Did the Bank, notwithstanding its officers were not advised of the transfer, have knowledge of such other facts in relation to the entire transaction as will now prevent its escaping liability? Stated otherwise: Whether in view of the conceded fact of knowledge of the incidents of July 16, will the Bank now be heard to say that it was ignorant of the vital fact that the money it got necessarily came out of the trust fund? In the case of Union Stock-Yards Nat. Bank v. Gillespie, supra, a case decided under the common-law rule, the facts in some respects resemble those in the instant case, and Justice Brewer in stating the duty of the bank in such circumstances said:

"It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. It is only

when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor."

Here the facts which may be said to be of a peculiar nature were that Fleming, the president of the Bank, knew on the 16th that Swartzell Company needed more than $600,000 to carry through the sale of its property, and Nevius, the vice president, knew that this amount which the Bank had lent had been added to the cash purchase price of the property to create a fund for the benefit of the noteholders, and that the whole sum had been set up as a trust fund on the books of the Bank. In addition to this, both Fleming and Nevius knew in the late afternoon of the same day that Swartzell Company's personal account was overdrawn. All these matters had been the subject of comment in the late afternoon of the 16th. And the next day they knew that the overdraft had been made good and that the borrowed money had been repaid. They say they did not know or inquire how this was done; that they regarded Swartzell Company, as indeed they had the right to do, as in every way responsible; that they knew that its average daily balance over a period of years had been approximately $300,000 and that it invariably had taken prompt care of its obligations. Satisfied with this, they apparently assumed that the money paid to them by Swartzell Company by its check in discharge of its note came from its own funds. There is no contradiction as to any of these matters, and so we are brought to the inquiry, were the facts and peculiar circumstances we have named enough to identify the fund out of which the payment was made so as to "inform the Bank of peculiar facts of equitable cognizance" that should debar it from treating the deposit as that of moneys belonging to the depositor?

In the Gillespie Case the facts on which the Supreme Court charged the Bank with liability were these:

" * * * the bank knew that the business of the Rappals [the depositor] was a failing one; that, instead of making money, they were gradually going deeper and deeper into debt. It knew that the Rappals were not buyers, but simply consignees and factors; and that the moneys received by them, on account of sales, of right belonged to their consignors and principals. It knew from the draft received that a shipment had been made to the Rappals. It knew that it had failed to give notice of the non-payment of the first and smaller draft, and so had put it out of the power of the consignors to protect themselves against the subsequent misconduct of the consignees and factors. It knew, or was chargeable with the knowledge of the fact, that the consignors were confiding in the consignees and factors on the strength of the representations it [the bank] had made. Upon non-payment of the first and smaller draft, it knew that it was in a position to easily acquire knowledge of the exact facts; and with its means of knowledge it [the bank] remained inactive and silent. With all these matters resting in actual or imputable knowledge, it accepts from the Rappals, consignees and factors, the proceeds of the sale of cattle consigned to them by the Gillespies."

In that case the account of the Rappals had been overdrawn from month to month unceasingly. The bank had recommended them to the owners of cattle as worthy of confidence. Two shipments of cattle had been made as the result of this commendation. The draft for the first lot had been received at the bank and not paid, and the bank's duty was to telegraph notice of the failure of payment, which it failed to do. The second shipment followed, and this draft likewise was presented to the bank and not paid, but the proceeds of the sale of the cattle when deposited in the bank were seized by it in payment of the indebtedness of the Rappals to it. The Supreme Court said that these facts were enough to create "constructive" knowledge on the part of the bank. But here we must have more than constructive knowledge if we are to give effect to the language of the act. There must be evidence from which we can say that the Bank had actual knowledge. To say that, we must rely wholly on the incidents we have referred to and disregard the testimony of Fleming and Nevius, the positive finding of the court below that there was no such knowledge, and the further finding of the court that:

"In all of the foregoing transactions between the Swartzell Rheem and Hensey Company and/or Rheem and Swartzell and the Bank, the Bank and each and every

one of its officers and employees taking any part in, or having any connection with, or knowledge of, any of the said transactions, acted in good faith and in the ordinary course of banking transactions with its depositors and customers. No officer or employee of the Bank had any knowledge that the Company or any officer or employee of it was acting or intended to act in bad faith in settling with the Shoreham Building noteholders, or any of them, or was misappropriating, or intending to misappropriate any of the proceeds of the payment of said notes."

■ The question is a difficult one, just as the case is a hard one. The loss of three-quarters of a million dollars must fall somewhere. Both the noteholders and the Bank innocently made possible the misappropriation. The noteholders, in appointing Swartzell Company their agent with authority, and without notice to them, to collect their money and release their security, afforded an opportunity to their agent to default. The Bank in its confidence in the rectitude and honesty of Swartzell and Rheem and in a lack of vigilance in checking up their transactions with the Bank, in like degree afforded the opportunity that ultimately resulted in the catastrophe. As its neglect was last in sequence, the law, as it formerly stood, would have imposed on it responsibility for restitution; but under the Fiduciaries Act, *as to the check transaction*, we think that, though the question is close, not enough of actual fact is shown to justify us in rejecting the findings of the trial court, for as the Supreme Court has said: "It is our duty to accept a finding of fact, unless clearly and manifestly wrong." Lawson v. United States M. Co., 207 U.S. 1, 12, 28 S.Ct. 15, 19, 52 L.Ed. 65.

As to the overdraft transaction, we are of opinion, for reasons which we shall now set out, that the rule of the common law should be held to apply.

As we have seen, the situation involved in the overdraft is a depositary-creditor situation, and hence we would normally look to sections 7, 8, and 9 of the act to govern liability thereunder. Section 7, however, does not apply because it relates to checks payable to the drawee bank upon trust funds standing in the name of the fiduciary as such. Section 8, to checks drawn by an agent on his principal. And section 9 is silent in respect of a bank's receiving trust funds into the individual account of the trustee and thereby wiping out an overdraft in that account. Section 9 having to do only with the payment of checks drawn on such account. Obviously section 4 does not cover the transaction, because the check transferring the fund was not an instrument payable or indorsed to the fiduciary as such, and section 5 does not apply because the payee referred to therein is a third party rather than a fiduciary personally; the latter situation being covered by section 6, which provides:

"If a check or other bill of exchange is drawn by a fiduciary as such * * * payable to the fiduciary personally, or payable to a third person and by him transferred to the fiduciary, and is thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith." D.C.Code 1929, T. 11, § 36.

The position of the Bank is that the clear language of this section precisely covers the case in hand because, it says, the Bank accepted in payment of an overdraft a check drawn on the original fiduciary account to the personal order of Swartzell Company, which in turn transferred it to the Bank. In other words, that the check was drawn by the fiduciary as such, payable to the fiduciary personally, and indorsed by it to the Bank, its personal creditor.

But we think the case we have here is not so simple. As we have seen, the purchaser of the Shoreham Building insisted that the money necessary to pay the notes and interest in full should be actually in the hands of the trustees and of Swartzell Company, the agent of the noteholders authorized to receive it. In the Rhoderick Case, supra, the same parties who are plaintiffs here insisted that the terms of the trust required the money to be paid directly to Swartzell Company as agent and that the payment jointly to Swartzell Company and the trustees was a violation of the provisions of the trust. But we said in that case that the manner

198

of payment, as it was shown, did not affect the situation; that the trustees under the deed of trust immediately and properly checked out the fund to the agent and relinquished any right of their own to its control. The check drawn by Swartzell and Rheem, trustees, and by Swartzell Company was, therefore, a check in compliance with the terms of the deed of trust. It accomplished what we said in the Rhoderick Case was the purpose of that instrument, for the deed of trust authorized Swartzell Company to collect the secured debt for the benefit of the noteholders and also provided that payment to Swartzell Company should be equivalent to payment to the noteholders personally.

But neither in form nor intent was the transfer of the fund by the check we have referred to in the nature of a check drawn by a fiduciary as such payable to himself personally. Both Swartzell Company and Swartzell and Rheem were fiduciaries in relation to the original trust deposit, but they were fiduciaries in different capacities. There was not such identity between the two that the check of both, payable to one, satisfied the letter of section 6. We think it clear that a particular type of transaction was contemplated by the authors of the act when they wrote in section 6; we have pointed out that the rule announced there is a striking departure from the prevailing case law prior to the act; and we are therefore of opinion that section 6 can be applied only to situations strictly within its letter and spirit.

■■■ Nor was the check in this case transferred by the fiduciary in payment of a personal debt of the fiduciary or otherwise. It was on its face simply a check payable to Swartzell Company and by it indorsed for deposit to its personal account. It was in fact the means or method of transfer of the whole trust res by one set of trustees to the other. By the transfer Swartzell Company intended that the Bank should credit the amount of the check to its personal account. The incidental result of this transaction was the payment of the overdraft then standing on the books of the Bank against Swartzell Company; but the payment thus effected was not the result of a negotiable instrument transaction such as the act deals with but was the result rather of a bookkeeping arrangement of credits and debits. The act has for its purpose the facilitation of commercial transactions in negotiable instruments. It

seeks to attain fluidity in the exchange of trust paper and to facilitate payment of debts by this means and to that end it relaxes some of the harsher rules which require of a bank and of individuals the highest degree of vigilance in the detection of a fiduciary's wrongdoing. But, as we have said, the act is not concerned with bookkeeping transactions. In this view, not only was the payment of the overdraft outside the language of section 6 but also outside its purpose and intent. The sole object which the section sought to accomplish was to permit a trustee as such to draw a check to himself personally and upon indorsement and delivery of the check to permit the taker, even though his personal creditor, to receive it without inquiry; and the justification given for this change of rule is that it may very well be that the trustee was entitled to receive payment from his principal's funds, as where the principal owed him salary, commissions, reimbursement for expenses, dividends, or the like. Here we have a transfer of funds by one set of fiduciaries to another—a transfer valid in itself but working no change in the trust nature of the account. Here the fund was transferred for deposit and was so accepted by the Bank, and so entered on its books; and it was only thereafter that its effect was to cancel the overdraft. In that view, to hold that the transfer was, as to a part thereof, payment to a personal creditor by a check "drawn by a fiduciary as such * * * payable to the fiduciary personally," would ignore, as we think, both the letter and the spirit of the act. Since the transaction is not covered by the statute, it comes within the scope of section 12, which provides that in such a case the recognized rules of law and equity relating to trusts shall continue to apply. Under those rules the Bank cannot escape from the liability to account for the amount of the trust fund received by it in payment of Swartzell Company's overdraft.

■■■ The judge below was of opinion that the Bank was not liable on either item because, as he thought, there had been no misappropriation. In his view, the payment by Swartzell Company to the Bank of the $635,000 notes resulting in the redelivery to it of collateral worth $859,000, the major part of which was subsequently distributed to some of the other beneficiaries of the trust, made the transaction in all respects like the purchase of notes for

the account of the trust. But we think the distinction is that the returned collateral was when delivered to the Bank and continued upon its surrender by the Bank to be part of the general assets of Swartzell Company and that the release of it with trust funds did not convert it into a part of the trust nor make the conversion of the fund any the less a misappropriation. The wrong had then been done. It is well settled that a beneficiary has no present ownership of or lien upon the general assets of his trustee; so that in this case it was of no moment to the noteholders that the personal estate of their trustee was sufficient to pay their claims in full. We notice this point in passing merely to indicate our view that the apparent ground of the lower court's action proceeded, as we think, from a mistaken conception of the effect of the release of the Swartzell collateral upon the rights of the parties.

The length to which this opinion has grown is regrettable, but the subject is new and—as we think—of general importance, and some repetition is perhaps permissible in the difficulty of applying the several pertinent provisions of the act to unusual facts.

On the whole case we think the decree of the District Court should be affirmed in part and reversed in part, and the case remanded for further proceedings consistent with this opinion. The costs will be divided.

Affirmed in part, reversed in part, and remanded.

STEPHENS, Associate Justice.

I agree with the majority that the conclusion cannot be reached that the Bank took the instruments in question with actual knowledge of breach of the fiduciary obligation or with knowledge of such facts that the action of the Bank in taking the instruments amounted to bad faith. The findings of the chancellor on the subject of knowledge are in the Bank's favor. Under the rule settled in this jurisdiction, while we are not absolutely bound by a chancellor's findings of fact, we do not disturb them on appeal unless upon an examination of the evidence they are clearly wrong. Dear v. Guy, 64 App.D.C. 314, 78 F.(2d) 198, certiorari denied, sub nomine Macrae v. Guy, 296 U.S. 585, 56 S.Ct. 96, 80 L.Ed. 414; Pollock v. Jameson, 63 App. D.C. 152, 70 F.(2d) 756; Rhoderick v.

Swartzell, 62 App.D.C. 180, 65 F.(2d) 813, certiorari denied 290 U.S. 677, 54 S.Ct. 100, 78 L.Ed. 584; Matson v. Rusch, 61 App.D.C. 184, 59 F.(2d) 360; Garrity v. District of Columbia, 66 App.D.C. 256, 86 F.(2d) 207; Hazen v. Hawley, 66 App.D. C. 266, 86 F.(2d) 217. See, also, United States v. United Shoe Mach. Co., 247 U.S. 32, 41, 38 S.Ct. 473, 62 L.Ed. 968. We cannot, I think, say under the evidence that the chancellor's findings are clearly wrong.

I agree also that Section 9 of the Uniform Fiduciaries Act (D.C.Code 1929, T. 11, § 39) applies to the receipt and payment to itself by the Bank of the check in payment of the notes and operates, knowledge being out of the case, to exonerate the Bank.

I disagree, however, with the view that Section 6 of the Uniform Fiduciaries Act (D.C.Code 1929, T. 11, § 36) does not apply to the overdraft transaction and, the question of knowledge being out of the case, exonerate the Bank in respect thereof. On the contrary I am of opinion that Section 6 clearly applies to the check as the result of the deposit of which the overdraft was paid, and operates therefore to exonerate the Bank from any liability in respect of this payment.

The fiduciary account was phrased as follows:

"Swartzell, Rheem & Hensey Co., and Luther A. Swartzell, and Edmund D. Rheem, Trustees under Deed of Trust dated August 1, 1928 and recorded in Liber 6194 folio 347 of D. C. Land Records, for account of holders of notes described in said trust.

SWARTZELL, RHEEM & HENSEY CO.

By /s/ Ed. D. Rheem

v.p.

/s/ Luther A. Swartzell $\Big\}$ Trustees"
/s/ Edmund D. Rheem

I think it clearly appears from the foregoing that not only are Luther A. Swartzell and Edmund D. Rheem fiduciaries for the account of holders of notes described in the trust, but that Swartzell, Rheem & Hensey Co. also is such a fiduciary. Conceding for the sake of argument that the phrase "Trustees under Deed of Trust" describes only the two individuals as distinguished from the Company, this seems to me an immaterial distinction. The controlling words in the account are "for account of holders of notes." Clear-

**200**

ly. enough all three of the parties, that is, the Company and the two individuals, are depositors, and depositors in an account which was "for account of holders of notes." This makes all three in equity, and on the face of the account, trustees for the noteholders. It follows that the check in the sum of $2,341,645.80, drawn on this account and signed by all three depositors, was within the terms of Section 6 "a check . . . drawn by a fiduciary as such . . . "; and it follows further, the payee of the check being "Swartzell, Rheem & Hensey Co.," that within the terms of the section the check was "payable to the fiduciary personally." That it was drawn by all three fiduciaries does not take it out of the phrase in the statute "drawn by a fiduciary." "In determining the meaning of any Act or resolution of Congress, words importing the singular number may extend and be applied to several persons or things; . . ." Rev.Stat. § 1, 1 U.S.C. § 1 (1 U.S.C.A. § 1). That the check was drawn in favor of but one of the three fiduciaries is in my view also immaterial. It is true that the section says "payable to the *fiduciary* personally" and the argument apparently is that this requires that a check, to be within the section, must be payable to all three fiduciaries, as if they were an entity. This seems a strained and unreasonable construction of the section and one out of harmony with the ordinary demands of trust administration, in the course of which, if there is more than one trustee—which itself is common in business practice—it is often necessary to draw checks on a fiduciary fund in favor of one of the trustees, for example, for his salary or for expenses advanced by him in behalf of the trust.

I think it further clear that when this check was endorsed for deposit and deposited, to the account of Swartzell, Rheem & Hensey Co. it was, within Section 6, "transferred by the fiduciary, . . . in payment of a personal debt of the fiduciary or otherwise." That it was transferred is without question. The transfer had two consequences: one, an immediate effect, to place to the credit of the Company the face amount of the check; the other, an ultimate effect, to pay the personal debt, the overdraft. The two effects are, in my view, within the phrase "in payment of a personal debt . . . or otherwise." That both effects were accomplished by means *of one* check cannot be material. It is too technical to say that the disjunctive is used

in the phrase in question with such absolute literalness that the "transfer" must be *either* in payment of a personal debt *or* with some other effect, but not with both effects. The disjunctive is to be used in the conjunctive as the sense of a statute requires. Union Insurance Co. v. United States, 6 Wall. 759, 18 L.Ed. 879; 2 Sutherland, Statutory Construction (2d Ed.) § 397, pp. 756-7. It is to me not believable that the Act was not intended by Congress to cover one check accomplishing two effects when the Act would clearly cover each of two checks accomplishing the effects separately.

I think it also unimportant in respect of the overdraft that the check was not in the exact amount thereof, but was for a larger sum. To require, for a check to be within the section, that it be in an amount identical with that of the personal debt, would, again, be for the Act to forbid the accomplishment under it with one check what could be validly accomplished by two.

I am unable to give weight to the further argument that because the check drew out the whole of the trust fund it is not covered by Section 6. It is undisputed that an essential purpose of the statute was to promote fluidity in negotiable instrument transactions, and I think the statute, with this end in view, makes the face of the check the test of its being within the statute. The face of this check did not show that the entire trust fund was being withdrawn. Only by comparison of the face of the check with the fiduciary account as set up would this be known. I think the statute covers a class of checks, to wit, those drawn by a fiduciary as such, payable to the fiduciary personally, and then transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, and that once a check is on its face within this class, the transferee is freed from duty to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument. It may be noted further that there are many business situations in which it is the duty of the fiduciary to draw out the entire trust fund. Indeed it was in this case. Rhoderick v. Swartzell, 62 App.D.C. 180, 65 F.(2d) 813, certiorari denied 290 U.S. 677, 54 S.Ct. 100, 78 L.Ed. 584. There are many situations of course in which to do this would be a breach of the trust. But I think it is the purpose

of the statute to free the transferee from inquiry into such questions.

The only argument which to me has any apparent validity, and I think it apparent only, against the applicability of Section 6 to the check in question, is that to the effect that, the purpose of the statute being to promote fluidity in negotiable instrument transactions, the statute is applicable only to negotiable instrument transactions as such, and that the payment of the overdraft was not itself immediately accomplished by the transfer of the check. The sole immediate effect of the transfer, it is urged, was to place the face amount of the check to the credit of Swartzell, Rheem & Hensey Co. in its individual account; the payment of the overdraft was through a bookkeeping entry by the bank, by virtue of which the amount of the overdraft was subtracted from the amount of the deposit. Putting it otherwise, it is said that the purpose of the statute was accomplished when the check, endorsed and deposited, was entered to the credit of the individual account of Swartzell, Rheem & Hensey Co., and that the statute does not reach the bookkeeping transaction by which the overdraft was paid. But this argument seems to me to fall for the following reasons: The phrase "personal debt" is in no manner limited in the statute and must therefore be taken to mean a personal debt however arising; and the drafters of the Act must reasonably be taken to have known that a not uncommon manner of incurring a personal debt is by overdraft, and also to have known that a common, perhaps the commonest, form of payment of an overdraft is by the deposit of a check to the overdrawn account. It gives too fine a literalness to the language of the Act to say that a check is not transferred in payment of a personal debt, because after it is deposited to the credit of the account which is overdrawn, a bookkeeping subtraction must be made to accomplish the payment. If in the instant case the check had been drawn in the exact sum of the overdraft and endorsed to the Bank, rather than for deposit to the account of Swartzell, Rheem & Hensey Co., and delivered to an officer of the Bank, it could not be doubted that the Bank could validly have taken it under Section 6 in payment of the overdraft. The distinction between this and the endorsement and deposit of such a check to the account in which the overdraft exists seems to me too insubstantial to have legal weight. If the former transaction is protected under the section, I cannot think the latter is not—merely because of the necessary bookkeeping subtraction following the deposit. Realistically, the transfer of the check did pay the overdraft. I have pointed out above that in my view the fact that the check was in an amount larger than the overdraft is also an insubstantial distinction.

The case is undoubtedly a hard one, it being inevitable that the loss must fall upon one of two innocent parties. But with great respect to the majority, I think the view that the transfer of the check with the ultimate effect to pay the overdraft is not within the terms of Section 6 is contrary to the plain and very broad terms of the section. Clearer and broader language than that of Section 6 could hardly have been chosen. I think the check in question, and its transfer, were clearly within the language of the section as a check "drawn by a fiduciary as such . . . payable to the fiduciary personally, . . . and . . . thereafter transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, . . . ."

I conclude therefore, on the whole of the case, that, knowledge being out of the case, the Uniform Fiduciaries Act applies to, and exonerates the Bank from liability in respect of, payment of both the overdraft and the notes, and thus I think the judgment of the trial court should be affirmed.

I am authorized to say that Mr. Justice VAN ORSDEL concurs in this separate opinion.