**Willie Ray BLANKENSHIP et al., Plaintiffs,**

v.

**W. A. (Tony) BOYLE et al., Defendants.**

**Civ. A. No. 2186–69.**

United States District Court, District of Columbia.

April 28, 1971.

Harry Huge, Edgar H. Brenner, Armistead W. Gilliam, Jr., Arnold & Porter, Thomas J. McGrew, Washington, D. C., for plaintiffs.

Paul R. Connolly, Paul M. Wolff, John W. Vardaman, Jr., Williams & Connolly, Washington, D. C., for defendants United Mine Workers of America and W. A. (Tony) Boyle.

Robert C. Barnard, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., for defendant George L. Judy.

Frank F. Roberson, Hogan & Hartson, Welly K. Hopkins, Washington, D. C., for defendants UMWA Welfare & Retirement Fund of 1950 and Josephine L. Roche.

John J. Wilson, Jo V. Morgan, Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendants National Bank of Washington and Barnum L. Colton.

John A. McGuinn, Patterson, Belknap & Farmer, Washington, D. C., for defendants Bituminous Coal Operators Ass'n and C. W. Davis.

## MEMORANDUM OPINION

GESELL, District Judge.

This is a derivative class action brought on behalf of coal miners who have a present or future right to benefits as provided by the United Mine Workers of America Welfare and Retirement Fund of 1950. Plaintiffs have qualified under Rule 23.2 of the Federal Rules of Civil Procedure. Jurisdiction is founded on diversity and on the general jurisdiction of this Court, 11 D.C. Code § 521, in effect at the time suit was filed.

Defendants are the Fund and its present and certain past trustees; the United Mine Workers of America; and the National Bank of Washington and a former president of that Bank.[1]

Plaintiffs seek substantial equitable relief and compensatory and punitive damages for various alleged breaches of trust and conspiracy. Defendants oppose these claims on the merits and in addition interpose defenses of laches and the statute of limitations. The issues were specified at pretrial conferences, and after extensive discovery the case was tried to the Court without a jury. Following trial, the case was fully argued and detailed briefs were exchanged. This Opinion constitutes the Court's findings of fact and conclusions of law on the issues of liability and equitable relief.

## I

## BACKGROUND

A. *Organization and Purpose of the Welfare Fund.*

The Fund was created by the terms of the National Bituminous Coal Wage Agreement of 1950, executed at Washington, D. C., March 5, 1950, between the Union and numerous coal operators. It is an irrevocable trust established

---

1. The Bituminous Coal Operators Association and two individuals named defendants, Carey and Titler, were dismissed at the close of plaintiffs' case for lack of proof. Schmidt and Waller were not served.

pursuant to Section 302(c) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186(c), and has been continuously in operation with only slight modifications since its creation.

The .Fund is administered by three trustees: one designated by the Union, one designated by the coal operators, and the third a "neutral party designated by the other two." The Union representative is named Chairman of the Board of Trustees by the terms of the trust. Each trustee, once selected, serves for the term of the Agreement subject only to resignation, death, or an inability or unwillingness to serve. The original trustees named in the Agreement were Charles A. Owen for the Operators, now deceased; John L. Lewis for the Union, now deceased; and Miss Josephine Roche. The present trustees are W. A. (Tony) Boyle, representing the Union; C. W. Davis, representing the Operators; and Roche, who still serves.[2]

Each coal operator signatory to the Agreement (there are approximately fifty-five operator signatories) is required to pay a royalty (originally thirty cents, and now forty cents per ton of coal mined) into the Fund. These royalty payments represent in excess of ninety-seven percent of the total receipts of the Fund, the remainder being income from investments. In the year ending June 30, 1968, royalty receipts totalled $163.1 million and investment income totalled $4.7 million. Total benefit expenditures amounted to $152 million.

In general, the purpose of the Fund is to pay various benefits, "from principal or income or both," to employees of coal operators, their families and dependents. These benefits cover medical and hospital care, pensions, compensation for work-related injuries or illness, death or disability, wage losses, etc. The trustees have considerable discretion to determine the types and levels of benefits that will be recognized. While prior or present membership in the Union is not a prerequisite to receiving welfare payments, more than ninety-five percent of the beneficiaries were or are Union members.

The Fund has maintained a large staff based mainly in Washington, D. C., which carries out the day-to-day work under policies set by the trustees. Roche, the neutral trustee, is also Administrator of the Fund serving at an additional salary in this full-time position. Thomas Ryan, the Fund's Comptroller, is the senior staff member next in line.

The trustees hold irregular meetings, usually at the Fund's offices. Formal minutes are prepared and circulated for approval. In the past, a more detailed and revealing record of discussions among the trustees has been prepared and maintained in the files of the Fund by the Fund's counsel, who attended all meetings. The Fund is regularly audited, and a printed annual report summarizing the audit and other developments was published and widely disseminated to beneficiaries, Union representatives, and coal operators, as well as to interested persons in public life.

From the outset the trustees contemplated that the Fund would operate on a "pay-as-you-go" basis—that is, that the various benefits would be paid out largely from royalty receipts rather than solely from income earned on accumulated capital. Always extremely liquid, the Fund invested some of its growing funds in United States Government securities and purchased certificates of deposit. It also purchased a few public utility common stocks, and in very recent years invested some amounts in tax-free municipal securities. The chart appended as Exhibit A reflects in a general way the growth of the Fund's assets and its investment history until June 30, 1969.

---

2. Lewis and Boyle have been the only Union trustees. There has been a succession of Operator trustees. Owen served until 1957, followed in sequence by Henry Schmidt, George Judy, Guy Farmer and C. W. Davis.

From its creation in 1950, the Fund has done all of its banking business with the National Bank of Washington. In fact, for more than twenty years it has been the Bank's largest customer. When this lawsuit was brought, the Fund had about $28 million in checking accounts and $50 million in time deposits in the Bank. The Bank was at all times owned and controlled by the Union which presently holds 74 percent of the voting stock. Several Union officials serve on the Board of Directors of the Bank, and the Union and many of its locals also carry substantial accounts there. Boyle, President of the Union, is also Chairman of the Board of Trustees of the Fund and until recently was a Director of the Bank.[3] Representatives of the Fund have also served as Directors of the Bank, including the Fund's house counsel and its Comptroller. The Fund occupies office space rented from the Union for a nominal amount, located in close proximity to the Union's offices.

### B. The Responsibilities of the Trustees

The precise duties and obligations of the trustees are not specified in any of the operative documents creating the Fund and are only suggested by the designation of the Fund as an "irrevocable trust." There appears to have been an initial recognition by the trustees of the implications of this term. Lewis, who was by far the dominant factor in the development and administration of the Fund, stated at Board meetings that neither the Union's nor the Operators' representative was responsible to any special interest except that of the beneficiaries. He declared that each trustee should act solely in the best interests of the Fund, that the day-to-day affairs of the Fund were to be kept confidential by the trustees, that minutes were not to be circulated outside the Fund, and that the Fund should be soundly and conservatively managed with the long-term best interests of the beneficiaries as the exclusive objective. While he ignored these strictures on a number of occasions, as will appear, his view is still accepted by counsel for the Fund in this action, who took the position at oral argument that the duties of the trustees are equivalent to the duties of a trustee under a testamentary trust. Counsel stated, "You can't be just a little bit loyal. Once you are a trustee, you are a trustee, and you cannot consider what is good for the Union, what is good for the operators, what is good for the Bank, anybody but the trust." (Tr. 2590).

This view, which corresponds with plaintiffs' position, is not accepted by all parties. While acknowledging that a trustee must be "punctilious," counsel for some of the parties urge that trustees as representatives of labor or management may properly operate the Fund so as to give their special interests collateral advantages (e. g., managing trust funds so as to increase tonnage of Union-mined coal), and that this is not inconsistent with fiduciary responsibility since such actions ultimately assist beneficiaries by raising royalty income. But there is nothing in the Labor-Management Relations Act or other federal statutes or in their legislative history which can be said to alleviate the otherwise strict common-law fiduciary responsibilities of trustees appointed for employee welfare or pension funds developed by collective bargaining. Indeed, the statute under which the 1950 Fund is organized was designed expressly to isolate such welfare funds from labor-management politics. In Lewis v. Seanor Coal Co., 382 F.2d 437, 442 (3d Cir. 1967), the court indicated that Congress was motivated by the example of the UMWA's pre-1950 Fund:

> This provision was written into the statute because of the special concern of Congress over the welfare fund of the United Mine Workers of America, which already was in existence and

---

3. Boyle resigned from the Bank board after the record in this case was closed and following his indictment for other alleged misconduct.

which Senator Taft described as administered without restriction by the union so that "practically the fund became a war chest * * * for the union."

See also United States v. Ryan, 350 U.S. 299, 304–305, 76 S.Ct. 400, 100 L.Ed. 335 (1956).

■ It is true that trustees are allowed considerable discretion in administering a trust as large and complex as the Fund. In determining the nature and levels of benefits that will be paid by a welfare fund and the rules governing eligibility for benefits, the trustees must make decisions of major importance to the coal industry as well as to the beneficiaries, and their actions are valid unless arbitrary or capricious. *E. g.*, Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425, 426 (1968); Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744, 747 (1963). On these matters, trustee representatives of the Union and the Operators may have honest differences in judgment as to what is best for the beneficiaries. Congress anticipated such differences in enacting § 302(c) of the Labor-Management Relations Act, and sought to temper them by the anticipated neutrality of the third trustee. The congressional scheme was thus designed not to alter, but to reinforce "the most fundamental duty owed by the trustee": the duty of undivided loyalty to the beneficiaries. 2 Scott on Trusts § 170 (3d ed. 1967). This is the duty to which defendant trustees in this case must be held.

### C. Conduct of the Trustees

Before dealing in detail with the specific breaches of trust alleged, a general comment concerning the conduct of the trustees is appropriate to place the instances of alleged misfeasance into proper context. It has already been noted that the trustees did not hold regular meetings but only met subject to the call of the Chairman. There was, accordingly, no set pattern for deciding policy questions, and often matters of considerable import were resolved between meetings by Roche and Lewis without even consulting the Operator trustee.

The Fund's affairs were dominated by Lewis until his death in 1969. Roche never once disagreed with him. Over a period of years, primarily at Lewis' urging, the Fund became entangled with Union policies and practices in ways that undermined the independence of the trustees. This resulted in working arrangements between the Fund and the Union that served the Union to the disadvantage of the beneficiaries. Conflicts of interest were openly tolerated and their implications generally ignored.[4] Not only was all the money of the Fund placed in the Union's Bank without any consideration of alternative banking services and facilities that might be available, but Lewis felt no scruple in recommending that the Fund invest in securities in which the Union and Lewis, as trustee for the Union's investments, had an interest. Personnel of the Fund went on the Bank's board without hindrance, thus affiliating themselves with a Union business venture. In short, the Fund proceeded without any clear understanding of the trustees' exclusive duty to the beneficiaries, and its affairs were so loosely controlled that abuses, mistakes and inattention to detail occurred.

## II

### ACCUMULATION OF EXCESSIVE CASH

#### A. The Breach of Trust

The major breach of trust of which plaintiffs complain is the Fund's accumulation of excessive amounts of cash. A basic duty of trustees is to invest trust funds so that they will be productive of income. *E. g.*, Barney v. Saun-

---

4. In one instance, Roche was momentarily troubled by Ryan's going on the Bank board but when she took this up hesitantly with Lewis he "just smiled," and Roche let the matter drop.

ders, 57 U.S. (16 How.) 535, 542, 14 L. Ed. 1047 (1853); Spruill v. Ballard, 36 F.Supp. 729, 730 (D.D.C.1941); In re Hubbell's Will, 302 N.Y. 246, 97 N.E.2d 888, 892 (1951); 2 Scott on Trusts § 181 (3d ed. 1967). It is contended that the trustees failed to invest cash that was available to generate income for the beneficiaries, and in total disregard of their duty allowed large sums to remain in checking accounts at the Bank without interest. It is further claimed that this breach of trust was carried out pursuant to a conspiracy among certain trustees, the Union, and the Bank through its President, and that all these parties are jointly liable for the Fund's loss of income resulting from the failure to invest.

That enormous cash balances were accumulated and held at the Bank over the twenty-year period is not disputed. The following figures are representative.

| Fiscal Year | Amount of Cash in Demand Deposits at End of Year | Percentage of Cash To the Fund's Total Resources |
|---|---|---|
| 1951 | $29,000,000 | 29% |
| 1956 | 30,000,000 | 23 |
| 1961 | 14,000,000 | 14 |
| 1966 | 50,000,000 | 34 |
| 1967 | 75,000,000 | 44 |
| 1968 | 70,000,000 | 39 |
| 1969 | 32,000,000 | 18 |

The significance of these huge sums has greater import when two factors are considered.

First, not only did the trustees have a duty to invest but the early minutes of the Fund clearly reflect the trustees' knowledge that income could be earned by investment in Government securities without sacrificing desired liquidity. The safety and practicality of using excess cash in this manner were also fully appreciated. Yet the money remained at the Bank on demand to the Bank's advantage but earning nothing for the Fund. This practice continued in spite of suggestions from successive Operator trustees that the money should be used to earn income for the beneficiaries.

Second, the Fund could easily have met its obligations with only a fraction of the cash maintained in its checking accounts, as the most cursory examination of its accounts clearly shows. The income and outgo were constant and unusual demands on the Fund could in any event always be anticipated sufficiently to liquidate Government securities should this have been unexpectedly necessary. Over the years the Fund paid out monthly approximately $10 million to $14 million for medical and pension benefits and administrative expenses. Against these obligations the Fund had a predictable steady income in the form of monthly royalty payments which, for each month in the years 1967, 1968 and to the date of the complaint in 1969, always totaled from $10 million to $14 million. In addition, there was regular, predictable investment income in the range of $2 million to $3 million per annum. Plaintiffs' Exhibit No. 1627, appended hereto as Exhibit B, charts the cash which was held in the General, Pension and Administrative checking accounts by month from 1953 to June 1969, and reflects the regularity of the Fund's income and outgo. It will be immediately noted that cash balances greatly in excess of the Fund's day-to-day needs were permitted to accumulate from the outset. Even the formula of having two to two-and-one-half times monthly expenditures in cash, a formula urged by the trustees as appropriate but without apparent justification, was ignored in practice.

The beneficiaries were in no way assisted by these cash accumulations, while the Union and the Bank profited; and in view of the fiduciary obligation to maximize the trust income by prudent investment, the burden of justifying the conduct is clearly on the trustees. Cf. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

Three explanations were seriously presented in justification of the cash accumulations: the trustees' general concern as to the future course of labor relations and other developments in the coal industry which might make it nec-

essary to have money readily at hand on short notice; tax factors; and what was characterized as inadvertence or accident. None of these explanations will withstand analysis.

(a) *Uncertainty about the future.* Prior to 1950, strikes and labor disputes had caused mine shutdowns, placing heavy demands on the then-existing welfare programs. Any repetition of these or similar conditions would have shut off royalty payments, perhaps for a considerable period. While this factor could therefore justify the trustees in maintaining a substantial, highly liquid reserve, it affords no justification for the failure of the trustees to put the large accumulations of excess cash to work for the beneficiaries. Roche testified that she favored maintaining an amount equal to several months' expenditures in cash, because "that is the only way you can be sure." Such naiveté by a trustee is unacceptable, particularly in light of the trustees' knowledge that short-term Government securities, which the evidence showed were redeemable on one-half hour notice, for example, were readily available and would have generated substantial income for the Fund while still assuring maximum liquidity.

This reliance on future uncertainty must also be weighed in the light of conditions existing in the coal industry in the latter years of the Fund's history under review. These were succinctly epitomized by a Union economist at the trial. In brief, it appears that beginning around 1960 the industry was profitable and increasingly stable, with encouraging prospects for the future, all of which was reflected in the increasing amount of coal mined and the favorable progress of the Union in its effort to organize increasing numbers of miners for work at the Union scale. Prosperous conditions made any reoccurrence of the pre-1950 experience far less likely.

(b) *Tax considerations.* The Fund has from the beginning been competently advised by experienced outside tax counsel. Naturally its return was examined by field audit from time to time. The Fund first sought an exemption from income tax as a charitable trust. This was denied in 1954, after a long delay while the requested ruling was being processed at the Treasury Department. This negative ruling was prospective, and thereafter the Fund understood that it would have to pay taxes on any amount of investment income that exceeded its administrative expenses. In fact, investment income never exceeded administrative expense and indeed was usually well below. In one year the spread was $2.4 million. It was obvious that even if income exceeded expenses and taxes became due on the excess, the Fund would have profited to the extent of its after-tax income.

An additional latent worry was apparently the possibility that royalties would be treated by the Internal Revenue Service as income, which would have been disastrous for the Fund. Tax counsel advised that royalties were not income, and they were so reported. The Internal Revenue Service agents conducting audits seemed interested in the point, but took no action. The Fund never asked for a ruling, preferring to let the Internal Revenue Service make the first move. When the question arose as to another welfare fund, the Anthracite Fund, the IRS eventually ruled that royalties were not income. Significantly, the Fund's representatives, although familiar with the Anthracite Fund's problem, were not sufficiently concerned even to inquire as to the final ruling of the IRS in the matter.

Thus none of these tax considerations can justify the trustees' failure to invest.

(c) *Accident or inadvertence.* There was no proof to support this desperate theory which the Fund itself does not advance and which in any event is in effect an admission of failure to adhere to minimum fiduciary standards of care and skill in administering the trust. 2 Scott on Trusts § 174 (3d ed. 1967). The Fund's Comptroller stoutly denies

accident or inadvertence, and the proof shows that the trustee well knew at all times that cash was steadily accumulating.

Under the most charitable view, this accident theory can help to account only for the staggering accumulations of cash in the period 1966 to 1968, when Lewis was in failing health and the trustees met infrequently. However, as is clear from the discussion of the conspiracy aspects of this case, *infra*, these accumulations were only an extension of a conscious, longstanding policy of the trustees.

The following testimony by Roche is revealing:

> Mr. Lewis felt very strongly, sir, the necessity of having a good deal beyond what we could invest without raising the taxation problem, keeping it very much in a situation where we could get at it at once. He did not feel enthusiastic for a long time over tax-exempt securities such as municipals.
>
> I talked to him frequently about it personally, aside from the general discussions we had. And I finally in '67–'68 realized how strongly I probably had been mistaken myself on anything that had to do with minute fiscal things. And I said, you know, Tom Ryan we both have the utmost confidence in, and he feels we ought to get some of this money out, make it earn money. Now let's think again about municipals. And he did * * * And finally he definitely agreed in '68, he said, Yes, we better go ahead, go ahead.
>
> \* \* \* \* \* \*
>
> So it was really a long-delayed decision which really probably, and I know completely from the point of view of a financial expert, that there is no excuse perhaps for it at all. To us who had felt that need, too, but felt these other things so terribly imminent, it is not the brightest chapter that we have, but we did some other

> things that perhaps made up for it a little bit.
>
> \* \* \* \* \* \*
>
> [T]he fiscal requirements certainly didn't justify what we had on deposit. I know that perfectly well.

(Transcript pp. 957–60.)

Considering this testimony, and the enormous cash balances which existed in 1966 through 1968, the following excerpt from "A Statement by United Mine Workers of America Welfare and Retirement Fund," printed in the United Mine Workers Journal on May 1, 1969, in answer to growing criticism of the trustees' policies, takes on special significance:

> *The criticism*: "Large" bank deposits drawing no interest.
>
> *The record*: At most times during our existence, our bank balances were not nearly so high as we would like to have them in relation to our monthly expenditures.
>
> In January of 1965 the Trustees made substantial improvements in the benefit programs which had the effect of increasing our expenditures by over $45 million annually. As a consequence, as income permitted, our cash balance was allowed to build up somewhat. Our cash balance on June 30, 1968, was actually no greater in relation to our monthly and annual expenditures than it had been at times in the past when expenditures were at a lower level.
>
> With the conclusion of negotiations for a new three-year contract between the Union and the operators in October, 1968, the potential need for cash reserves has lessened and these balances have been reduced considerably.

This statement was signed by Roche, Ryan, and Welly K. Hopkins, General Counsel of the Fund. It is not only lacking in candor, as was much of Ryan's testimony at trial, but actually misleads.

■ The trustees well knew that cash deposits at the Bank were unjustified.

It was a continuous and serious violation of the trustees' fiduciary obligation for them to permit these accumulations of cash to remain uninvested. It remains to be determined whether the Union, the Bank, or certain individual defendants are also responsible for the breach of trust.

### B. The Conspiracy as to Cash Deposits.

Plaintiffs contend that the Union and the Bank conspired with the trustees to maintain the excessive cash at the Bank for their respective benefit. On this phase of the case the applicable law is well established and need here only be briefly summarized.

■■ A conspiracy is an agreement between two or more persons to accomplish an unlawful object or to accomplish a lawful object in an unlawful manner. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Edwards v. James Stewart & Co., 82 U.S.App.D.C. 123, 160 F.2d 935, 937 (1947). The gist of a civil conspiracy, however, is not the agreement itself, but the civil wrong alleged to have been done pursuant to the agreement; the allegation of conspiracy bears only upon evidentiary and other formal matters. Edwards v. James Stewart & Co., supra; Ewald v. Lane, 70 App.D.C. 89, 90, 104 F.2d 222, 223 (1939); Martin v. Ebert, 245 Wis. 341, 13 N.W.2d 907, 908 (1944). The civil wrong here is a breach of trust; and it is settled that where a third person "has knowingly assisted the trustee in committing a breach of trust, he is liable for participation in the breach of trust." 4 Scott on Trusts § 326 (3d ed. 1967); See Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921). If the third person's participation in or inducement of the breach is pursuant to an agreement with one or more of the trustees, he is liable as a conspirator.

That there was opportunity to conspire as to the cash balances cannot be doubted. There is, however, no direct evidence of an agreement, no unguarded admissions of conscious impropriety. Lewis, the dominant actor in these events, is dead and the named individual defendants contest charges of conspiratorial participation. Plaintiffs rely on documents, circumstantial evidence and inference to support the claim.

Despite the denials, there is clear and convincing proof that there was an agreement among Lewis, Roche, and Colton made contemporaneously with the creation of the Fund and the Union's acquisition of a controlling interest in the Bank, to use the Bank as the sole depository of Fund moneys and to maintain large sums in interest-free accounts at the Bank without regard to the Fund's needs. Late in 1949, Lewis, through an agent, solicited Colton to become president of the Union's newly acquired Bank. At their second meeting, Lewis discussed with Colton the transfer of both the Union and the Fund accounts from previous depositories to the National Bank of Washington. As early as April 30, 1950, the Fund had over $36 million on deposit in checking accounts at the Bank, and the balance remained near or above this level for more than a year thereafter. Over the next twenty years the trustees' decision to leave cash in the Bank without interest greatly benefited the Bank and the Union as the Bank's majority shareholder. At all times these sums well exceeded the immediate cash needs of the Fund, as the previous discussion has shown.

This banking arrangement met strong objection from the Operators' trustee, Owen, who at a trustees' meeting as early as August, 1950, demanded that all moneys of the Fund be withdrawn from the National Bank of Washington. He stated:

It is undoubtedly the law that a trustee should not deposit trust funds in a bank which he controls or in which he has a substantial participation, Amongst other criticism, he may cause the dividends upon his stock to be enhanced by the Bank's use of a

large deposit of his trust's funds for loan purposes. Also, conflicting interests may arise; or, losses may occur. The trustees' minutes through 1950 and 1951 reflect that Lewis and Roche, rather than replying to Owen's repeated complaints on this score, ignored his protests altogether and Lewis even equivocated as to his interest as a trustee holding bank stock for the Union.[5] In March of 1951, Owen included the Fund's relationship with the Bank as one of four matters on which he believed his proposals had been rejected, "utterly without justification," by Lewis and Roche "acting jointly."

The formal minutes of the Fund reflect practically none of this crucial discussion held at trustee meetings. Mitch, the Fund's attorney, attended the meetings, however, and thereafter prepared what he designated a stenographic draft of the proceedings based on copious contemporary notes. The stenographic drafts are in evidence. These were reviewed by Roche and possibly others and a truncated, far less informative formal minute was developed. Roche struck out most of the informative detail. No satisfactory explanation was offered as to why this was done, and the inference is unavoidable that Lewis and Roche had a conscious desire to conceal the actual embarrassing discussions that had taken place.

Lewis and Roche chose, without taking legal advice in the face of strong objection to the legality of their actions, to advance the interests of the Union and the Bank in disregard of the paramount interest of the beneficiaries who were entitled to receive the benefit of prudent investment of their funds.

The Union urges that Lewis kept his own conscience, acted solely as a trustee and after 1960, when he became President Emeritus, an honorary position, was wholly removed from any executive authority in the Union's affairs. Hence,

it is claimed, the Union cannot be held responsible for Lewis' actions, neither prior to nor especially after 1960. This position cannot be squared with the facts. Lewis totally dominated the Union both before 1960 and to a large extent thereafter, especially as to financial matters, including the Fund. Other Union officers knew of Lewis' actions with regard to the Fund and the Bank, but uttered not a word of protest. While Boyle, in the period after 1960, often suggested that Lewis raise pensions, which would have had the effect of reducing the Fund's bank balances, neither Boyle nor any other officer sought to break the longstanding practice of retaining Fund moneys in non-interest-bearing checking accounts at the Bank rather than in investments. When the Welfare Fund agreement was renegotiated in 1964, 1966 and 1968, the Union could have designated another representative to act as trustee, had it been unwilling to accept the benefits of the course that Lewis had so obviously set.

The inference is also unavoidable that Lewis made more than a mistake of judgment as a trustee. He acted to benefit the Bank and to enhance its prestige and indirectly the prestige of the Union, not simply to keep money needed by the Fund in a safe place. The minutes show that he knew the large demand deposits were unnecessary for any legitimate purpose of the Fund. Moreover, he was not lacking in financial sophistication. He had been president of a bank himself and the record shows his many financial dealings and the manner in which, as President of the Union, he utilized the considerable financial resources of the Union for the Union's benefit. The conclusion is clear that Lewis, in concert with Roche, used the Fund's resources to benefit the Union's Bank and to enhance the Union's economic power in disregard of the paramount and exclusive needs of the bene-

5. The stock of the Bank owned by the Union was held by the three Union officers named trustees for the Union. Lewis and later Boyle were each a trustee during their respective service as President of the Union.

ficiaries which he was charged as Chairman of the Board of Trustees to protect.

Lewis acted for the Union when he entered into the conspiracy.[6] A conspiracy once formed is presumed to continue; to escape continuing liability, a party must affirmatively withdraw from the conspiracy and seek to avoid its effects. *See* Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767, 784 (6th Cir. 1970). The Union did not withdraw from the conspiracy; it had full power to end this breach of trust, yet it knowingly perpetuated the breach and continued to reap the benefits thereof.

Any doubt as to Lewis' motivation is fully dissipated by other evidence showing respects in which the Fund was used to benefit the Union during Lewis' chairmanship, to be discussed later. There is no suggestion that Lewis personally benefited, but he allowed his dedication to the Union's future and penchant for financial manipulation to lead him and through him the Union into conduct that denied the beneficiaries the maximum benefits of the Fund. A finding of conspiracy to maintain excessive cash at the Bank, justifying an award of damages against the Union in favor of the beneficiaries, is required.

The Bank, for its part, contends it played no conscious role in these arrangements and that it merely acted as a responsible banker handling the Fund's business in accordance with sound conservative banking practice. To be sure, the Bank did not overreach in any manner. It treated the Fund fairly. It performed extensive services for the Fund free of charge. There is no showing that the Bank conducted its business on the premise that the cash would not be summarily withdrawn. It was always highly liquid—indeed more liquid than other comparable banking institutions. Moreover, it did not receive any pressure from the Union to increase dividends for the Union's benefit, and dividend levels were in accord with the general parsimony that conservative bankers usually display toward shareholders at dividend time. There is no evidence that the Union or anyone connected with the Fund ever required the Bank to loan money to a friend or associate without adequate security and no such loans were made. Nor did the Bank show any favoritism toward the Union or the Fund contrary to proper banking standards.

While the measure of the benefits the Bank received from this relationship is unclear, and certainly not as monumental as the size of the deposits suggests, the Bank was in a position to make money on the Fund's large demand deposits and in fact did just that. The deposits enhanced the Bank's earnings and its prestige and position in the banking community.

It is likely that the initial agreement among the Union (acting through Lewis), Roche, and the Bank (acting through Colton), to maintain trust accounts in a bank substantially owned by a Union whose president was a trustee, and the losses of income to the beneficiaries caused thereby, are sufficient without more to hold the Bank liable in conspiracy for damages under the special circumstances of this case.[7]

---

6. The Union claims that it cannot be held liable for the acts of Lewis except upon "clear proof" that the membership of the Union actually participated in, authorized, or ratified his actions. This position is based upon Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106. Section 6, however, applies only to actions taken in the course of a labor dispute. By no view of the facts in this case can the management of the Welfare Fund by its trustees be termed a "labor dispute" as that phrase is defined in 29 U.S.C. § 113 (c). See Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 146–147, 62 S.Ct. 520, 86 L.Ed. 750 (1942).

7. This theory of the case would present the question whether it was a breach of trust for the trustees to deposit any money whatsoever in the Union's bank. There is a conflict among the cases as to whether a

This was not the theory on which plaintiffs proceeded, however, and the Court need not make such a finding.

The Bank recognizes, as does the Court, that the above facts, plus a showing of actual knowledge on its part that the funds maintained by the trustees in non-interest-bearing accounts were substantially in excess of the Fund's need for cash, will render it liable. The Bank vigorously denies that any such actual knowledge may be inferred from the facts established at trial. A review of those facts leads the Court to a contrary conclusion.

The Bank knew, from the time of the 1950 meeting between Lewis and Colton, that the accounts came to the Bank without solicitation at the initiative of the Chairman of the Board of Trustees of the Fund who was also President of the controlling shareholder of the Bank. The Bank knew that these were trust accounts, and from its own extensive experience in acting as trustee knew of the high standards governing the conduct of trustees. The Bank knew the actual dollar amounts in the Fund's various interest-free accounts, and the percentage of the Fund's total assets that these accounts represented. The offices of the Bank, the Union, and the Fund were in close physical proximity. There were a number of interlocking relationships among the Union, the Bank, and the Fund throughout the twenty-year period.[8] Colton, the President of the Bank, was well aware of the propensity of the Union to use the Bank for Union objectives, as witnessed by his remarkable personal financial dealings with the Union, the Bank's loans to coal operators backed by Union collateral, and the unusual financial relationships between the Union and Cyrus Eaton, which the Bank aided.

The Bank strongly urges that it was ignorant of the terms of the trust agreement, the needs of the Fund for liquidity, or the possible tax consequences of enlarging the Fund's investment income, and hence that it had no way of knowing whether or not the obvious failure of the trustees to invest constituted a breach of trust.[9] Any inquiry into these matters would, of course, have revealed

---

trustee may under any circumstances deposit trust funds in a bank in which he has a substantial interest. See the full discussion in 2 Scott on Trusts §§ 170.18, 170.19 (3d ed. 1967); *compare* Caldwell v. Hicks, 15 F.Supp. 46 (S.D.Ga.1946) (deposit improper), with In re Sexton, 61 Misc. 569, 115 N.Y.S. 973 (1908) (deposit proper). It is universally held, however, that any such deposits will be subjected to the closest scrutiny for signs of self-dealing or negligence where the bank fails or the funds are left on deposit uninvested for an excessive period of time. *See, e. g.,* In re Culhane's Estate, 269 Mich. 68, 256 N.W. 807, 811 (1934). And where the bank has notice that the trustee is acting in breach of trust in allowing such deposits to be made, it is liable along with the trustee for losses to the trust. *See* Olin Cemetery Ass'n v. Citizens Savings Bank, 222 Iowa 1053, 270 N.W. 455, 459 (1936). Where the initial deposits are upwards of thirty million dollars and form a substantial percentage of the bank's business, as in the case of the Fund, it would be an extreme principle which would absolve the bank from any responsibility for resulting losses to the trust.

8. In considering the interlocks between the Bank and the Fund, two individuals involved occupied positions of special significance. Ryan, the Fund's comptroller, knew full well that the cash deposits were excessive and, in effect, at one stage had so advised the trustees. He was named to the Advisory Board at the Bank in 1963, and became a director in 1965. He was also an honorary member of the Union. Hopkins, initially inside general counsel of the Union and later inside general counsel of the Fund, was a director of the Bank and of course fully familiar with the provisions of the Trust and the legal responsibilities of the trustees. He attended trustee and Bank meetings. The knowledge of Ryan and Hopkins, insofar as it arose from their duties at the Fund, is not strictly imputable to the Bank. *See* Arlington Brewing Co. v. Bluethenthal & Bickart, 36 App.D.C. 209 (1916); 3 Fletcher, Cyclopedia of Corporations §§ 793, 808 (Rev. ed. 1965). Their knowledge was, however, continuously available to the Bank throughout the period.

9. The only reference in the testimony to any communication on these matters be-

their total irrelevance to the startling size of the cash deposits continuously maintained by the trustees over almost twenty years. In the face of its full knowledge as to the size of the deposits and the relationship between the Union and the Fund, the Bank could hardly have assumed that the deposits were justified by any such possibilities. Its lack of inquiry into these suspicious matters is only further evidence of the Bank's awareness of the real reason for the deposit benefits it was receiving year after year.

Never in this entire period, Colton testified, did he ever discuss the Fund's accounts with anyone, inquire as to the Fund's needs or plans, or question the propriety of what was taking place. Not even casual inquiries were addressed to the interlocking directors and the nature or future prospects of the account were never mentioned at a single Board meeting. Since the Fund's business with the Bank accounted for over twenty percent of the Bank's time deposits and grew to over thirty percent of its demand deposits, this disinterest in the Bank's principal account is indeed more than remarkable. Perhaps this may be accounted for by incompetence, but Colton did not exhibit this characteristic on the stand. His explanations are unacceptable. In the light of all the facts and circumstances this silence and disinterest buttress the sole inference permissible on the totality of all the facts: that the Bank knowingly accepted and participated in a continuing breach of trust that redounded substantially to its own benefit.

This conclusion draws strong support from the cases which hold that where a bank enters into a transaction with a trustee, with actual or constructive knowledge that the transaction is in breach of the trustee's fiduciary duty, the bank may be held liable for the resulting loss to the trustee. *See, e. g.,* Union Stock Yards Bank v. Gillespie, 137 U.S. 411, 416, 11 S.Ct. 118, 34 L.Ed. 724 (1890); Anacostia Bank v. United States Fidelity & Guaranty Co., 73 U.S. App.D.C. 388, 119 F.2d 455 (1941); American Surety Co. v. First National Bank, 141 F.2d 411 (4th Cir. 1944); Restatement of Restitution § 138 (1937); 4 Scott on Trusts §§ 324 et seq. (3d ed. 1967). It is true, as the Bank suggests, that the Uniform Fiduciaries Act, 21 D.C.Code § 1701 et seq., modifies the law in this jurisdiction to limit a bank's liability for transactions with a trustee to cases in which the bank has actual knowledge of a breach of trust or knowledge of such facts that its action amounts to bad faith. In Colby v. Riggs National Bank, 67 U.S.App.D.C. 259, 92 F.2d 183 (1937), the Act was construed to require "actual knowledge of misappropriation," and misappropriation was taken to mean "wrong appropriation, or the use of a fund to a different purpose from that for which it was created; but not necessarily a dishonest purpose." 67 App.D.C. 259, 270 92 F.2d 183, 194. As the foregoing discussion demonstrates, the Bank knew that the money deposited in the Fund's checking accounts was being used for an improper purpose over a twenty-year period.

The Bank and the Union seek support from United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), and Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). Both those cases dealt with the sufficiency of the evidence to support an inference of conspiracy. The decisions and, at the most, for the proposition that the act of selling morphine in large quantities to a doctor known to

---

tween Lewis and the Bank is the following, from the cross-examination of Colton:

Q: Did Mr. Lewis ever tell you anything about the need of substantial balances in the fund accounts?

A: It seems to me that in the early '50s they had some difficulties and Mr. Lewis made the statement to me in one of our meetings that he would like to feel that the fund always had sufficient funds on hand to protect several monthly payments to miners so they shouldn't be in the position of being short of money. [Transcript p. 197.]

be selling drugs illegally is sufficient to support a finding of conspiracy to violate the narcotics acts; while the act of selling sugar in large quantities to a known bootlegger is not necessarily sufficient to support a finding of conspiracy to violate the alcoholic beverages acts. This distinction, which counsel for the Union correctly labeled "a question of how bad the fish smell," is irrelevant in this case; for it is not only the nature and size of the deposits involved, but also the close and interlocking relationships among the Fund, the Union, and the Bank, the evidence of the original understanding between Lewis and Colton, and the long course of dealing to mutual advantage that irresistibly support a clear inference of conspiracy here.[10]

To summarize this aspect of the case, the Court finds: an agreement among Lewis, Colton and Roche to maintain on deposit at the Bank substantial sums in interest-free accounts, without relation to the real needs of the Fund for liquidity or otherwise, for the benefit of the Union and the Bank and in disregard of the best interests of the beneficiaries; knowing participation in the breach of trust by the Union and the Bank, beginning in 1950 and continuing at least until this lawsuit was filed; and resulting injury to the beneficiaries measured by the loss of income on funds wrongfully maintained in interest-free accounts.

### III

### OTHER BREACHES OF TRUST

Plaintiffs specified at pretrial six categories of conduct, in addition to the excessive cash balances, allegedly constituting breaches of trust and claimed that as to each the Union, the Bank, and the individual defendants conspired. Some of these claims were abandoned in whole

or in part as proof developed in the course of the trial, and only those fiduciary issues remaining at the end of trial need to be considered in this opinion. The Court is satisfied that plaintiffs have by clear and convincing evidence established conduct which violates the trustees' fiduciary duty to the beneficiaries in all respects still urged, except with regard to the claim that the trustees failed to collect or properly to determine delinquent royalty payments. The Bank and Colton are not shown to have conspired as to any of these breaches, and no participation by the Union was proved except as hereinafter indicated.

### A. Withholding Health Cards

The proof on this issue reflects a serious impropriety by the then-trustees of the Fund which has now apparently been rectified. Coal miners entitled to benefits are issued health cards which are used to obtain appropriate medical and hospital services directly from local physicians. When certain marginal coal operators in some sections of the country failed to account properly for royalties, and hence were in flagrant violation, the health cards of miners employed by those operators were revoked by the trustees, apparently on the theory that this action would lead the operators to pay up to avoid wildcat strikes. This practice was highly improper, for the benefits owed the miners as qualified beneficiaries could not, under the terms of the Fund, be cancelled solely because their particular employer was in default on his royalty payments. This policy was of limited duration. Initiated in 1962, it was terminated by 1966 and affected some 7,000 card holders. It was arbitrary and capricious, and hence constituted a breach of trust. There is no

---

10. The finding of an agreement between Lewis and Colton in 1950 is not an essential element of the cause of action against the Bank and Colton as to the later years of the period under review. For whatever the nature of the understanding at the time the account was opened, the continuous maintenance of huge sums of money in demand deposits over the years was more than sufficient to convey to Colton and the Bank knowledge that the Bank was benefiting from a breach of trust.

proof, however, that this action was taken by the trustees to assist the Union in the conduct of labor disputes, nor is there any other proof of conspiracy on this aspect of the case.

## B. Use of Misleading Application Forms

█ The proof showed that the Fund called on Union locals to assist beneficiaries and potential beneficiaries of the Fund in preparing pension applications, and to carry out other administrative functions. It should be understood that the Fund as a practical matter is required to work through the locals in processing applications. The expense of establishing field offices exclusively for the Fund would be enormous, and in any event information from Union records may be required as a cross-check on the applicant's representations. This arrangement, however, has been seriously abused, and the trustees must be held at least partially responsible.

The trustees sponsored an application form which incorrectly implies that Union membership and Union approval is necessary before an application will be processed. The Application for Pension, for example, carries at its foot a space for certification by the local and by the district that the applicant "is currently a member of Local Union No. ___" and "is a member of District No. ___." There is ample documentary and testimonial evidence that applicants were improperly led by this form and by the locals to believe that Union membership was a prerequisite for eligibility, and were often forced to make substantial payments, sometimes running into hundreds of dollars, as "back dues" to reinstate their Union membership. The full extent of illegal collection of back dues by the Union through this device is unknown.

There is no proof that the trustees had actual knowledge of these improper practices by Union locals. In delegating certain functions to the Union local and district offices, however, they should have recognized the potential for abuse of the benefit application process where non-Union member beneficiaries were concerned. In continuing to use patently misleading forms which encouraged applicants to believe that a paid-up Union membership was a prerequisite to receiving benefits, the trustees were grossly negligent, to an extent that constitutes breach of trust. The trustees have apparently not acted decisively even to this date to terminate use of these misleading forms.

No cause of action was pleaded against the Union for fraud in collecting back dues from individual beneficiaries. Although the Union knowingly used the trustees' neglect to its own advantage, damages are recoverable only by individual beneficiaries who were defrauded, not by the trust itself. Since this action is only derivative, relief on this aspect of the case will be limited to an injunction to terminate the improper use of application forms in the future.

## C. Investment in Utility Stock

█ This issue relates to the Fund's purchases of stock of certain electric utility companies, principally Cleveland Electric Illuminating Company and Kansas City Power & Light Company. While these stocks are on the list approved for trustees, the propriety of these investments is challenged on the ground that they were made primarily for the purpose of benefiting the Union and the operators, and assisting them in their efforts to force public utilities to burn Union-mined coal. The investments have declined in value and are said to have been in violation of the trustees' duty of undivided loyalty to the beneficiaries.

In the late 1950's and early 1960's, the Union was engaged in a vigorous campaign to force public utility companies to purchase Union-mined coal. Public relations and organizational campaigns to this end were pressed vigorously in several cities. Lewis, then a trustee, worked closely with Cyrus S. Eaton, a

Cleveland businessman. It is undisputed that between February and April 1955 the Fund purchased 30,000 shares of Cleveland Electric, and in March of that year the Union loaned Eaton money to enable him to buy an additional 20,000 shares. Eaton then went on the Board of Directors of Cleveland Electric. Similarly, between January and March 1955 the Fund purchased 55,000 shares of Kansas City Power & Light, and in June of the same year the Union loaned Eaton money to buy an additional 27,000 shares. In each of the years from 1956 to 1965 the Fund gave a general proxy for all of its shares in Cleveland Electric and Kansas City Power & Light to Eaton. The Union and Eaton were pressing the managements of each company to force them to buy Union-mined coal. The Fund purchased both Cleveland Electric and Kansas City Power & Light stock on the recommendation of Lewis, who was then fully familiar with the Union's activities affecting these companies and proxies were given to the Union by the Fund at Lewis' request.

Schmidt, who became a trustee of the Fund in 1958, was president of the principal coal operator standing to benefit from Cleveland Electric's additional purchases of Union-mined coal. He was acquainted with the activities of the Fund and of the Union with respect to Cleveland Electric, and actively encouraged them. When the Union's campaign to push Union-mined coal focused on Cleveland Electric in 1962 and 1963, the Fund purchased an additional 90,000 shares, with the hearty approval of Schmidt.

Further indication that these particular challenged stock purchases were made primarily for the collateral benefits they gave the Union is found in a general course of conduct. Lewis and Widman, the Union man spearheading the efforts to force utilities to buy Union-mined coal, discussed some seventeen utility companies on the Fund's investment list, looking toward the possibility of obtaining proxies from fifteen. Proxies were in fact given the Union by the Fund not only on Cleveland Electric

and Kansas City Power & Light, but on the shares the Fund held in Union Electric, Ohio Edison, West Penn Electric, Southern Company and Consolidated Edison. The intimate relationship between the Union's financial and organizing activities and the utility investment activities of the trustees demonstrates that the Fund was acting primarily for the collateral benefit of the Union and the signatory operators in making most of its utility stock acquisitions. These activities present a clear case of self-dealing on the part of trustees Lewis and Schmidt, and constituted a breach of trust. Roche knowingly consented to the investments, and must also be held liable. The Union is likewise liable for conspiring to effectuate and benefit by this breach of trust.

### D. Collection of royalties.

The Fund followed a set routine to make sure royalties were current and fully paid. Reports filed by operators with state and federal authorities were carefully checked and correlated with any information available from the Union. Delinquency notices were sent to any operator in arrears, and if payments were not brought into line the matter was referred to counsel. Numerous suits were filed when the controversies could not be resolved by negotiation. Collection techniques were vigorous and persistent.

It was inevitable over a twenty-year period that some operators would fail to pay royalties on time. This was particularly likely in the case of marginal operators confronting financial difficulties of one kind or another, but occasionally larger operators were also in default. Some delinquencies reflected honest differences as to the amount owing. There was never a time, however, when overdue royalty payments represented more than a small fraction of the operators' royalty obligations. Royalties were delinquent in amounts ranging from $5 million to a high of $9 million per annum. These figures contrast with annual royalty receipts in the range of

$170 million to $185 million. Moreover, collection efforts were in progress on many of these delinquencies.

Two specific situations were highlighted by the proof. Plaintiffs leveled particular criticism at arrangements made by the trustees to collect royalties from some small operators by dealing with associations representing those operators, and also at the Fund's failure promptly to collect royalties from West Kentucky Coal Co., a large operator controlled by the Union in conjunction with Cyrus Eaton and defendant Colton, then President of the Bank. Admittedly the trustees had to make difficult business judgments in each of these situations, but the evidence of breach of trust is not clear. In the first instance the actions of certain locals[11] and the inadequacy of available records of coal mined made effective collection impractical. The cost of pursuing some of these small operators would undoubtedly have exceeded the royalty sums, if any, that would by legal or other means ultimately have been collected.

In the instance of West Kentucky, a substantial dollar delinquency, as high as $700,000 in 1961, was tolerated over a period of time. This company, a large but marginal operator, in 1963 eventually made its royalty payments current with aid of an ear-marked loan from the Union, and its royalty payments to the Fund eventually exceeded $40 million. Difficult judgments had to be made by the Fund's representatives during the period of deficiency, but these were made honestly and the decision temporarily to tolerate substantial non-payment ultimately redounded to the benefit of the Fund.

The Union's heavy stock interest in West Kentucky (acquired as early as 1954) should have disqualified Lewis from any participation as a trustee in decisions involving royalty collections from that company. He wholly ignored

the conflict of interest. The Fund was placed in an indefensible position of having to deal with a Union-controlled operator. The royalties were eventually paid, however, and no substantial dispensations were granted West Kentucky which were not granted other flagrantly delinquent operators. Thus the West Kentucky episode reflects the loose standards of fiduciary responsibility which governed Lewis' conduct rather than a breach of trust by any other trustee.

### E. Pension Increase

One of the principal subjects of inquiry at the trial involved the circumstances under which monthly pensions were raised from $115 to $150 on June 24, 1969. This $35 increase was not without consequences, since it involved an additional annual disbursement from the Fund of approximately $30 million. Plaintiffs do not seek a rollback of the pension increase, but assert that the motives for which it was made, and the manner in which it was made, are grounds for removal of Boyle as a trustee, and for monetary relief from Boyle, Judy, and the Union for any injuries the Fund may suffer as a result of the action. A full discussion of the incident is required.

Roche broke her hip early in June, 1969, and for most of that month was recuperating at the Washington Hospital Center. She was nonetheless in frequent contact with her office by telephone and although immobile was otherwise fully functional. Lewis, still a trustee, was at home in Alexandria where he had remained more or less continuously for many months. He was alert but his health was failing. No trustee meeting had been held since February, 1969. Schmidt, the Operator trustee, had resigned on that date and a vacancy existed. On June 4, 1969, defendant Judy was installed as Schmidt's

11. In the period 1959-1964, the trustees were hobbled in collecting royalties from some 16 to 18 small operators because Union organizers had told the mines they didn't have to pay full royalties. This practice by the Union organizers was improper, but the evidence failed to show complicity by the trustees of the Fund.

successor at a brief semi-social meeting held at Lewis' home. Roche, already hospitalized, knew of the meeting and approved of Judy's designation, but could not attend.

Lewis died on June 11, 1969, and Boyle, who had been president of the Union since 1963, was designated as the Union's trustee representative, and hence Chairman of the Board of Trustees of the Fund, at a meeting of Union officials on June 23. Boyle had received some general information concerning the Fund's operations which led him to feel that a sizable pension increase could be financed. As an energetic Union leader, he was confident that if additional money were needed, the operators could be forced to increase their royalty payments when the next collective bargaining agreement was negotiated. He felt the unexpended balance of the Fund was far too large, and that a pension increase was long overdue. Indeed, at Union meetings and elsewhere he had promised that if he ever had anything to do with the matter he would increase pensions at the earliest possible opportunity. Boyle had urged Lewis to raise the amount of the pension but Lewis had refused to act.

When Lewis died and Boyle was named trustee, an election contest for presidency of the Union was looming.[12] Boyle undoubtedly recognized that if he delivered on his pension promises to the rank and file, his position would be strengthened in the campaign. These election considerations account for the timing of his actions, but they were not the primary factor motivating Boyle. He genuinely believed that a pension increase should be made in the interests of the miner beneficiaries. Boyle knew that Roche was opposed to a pension increase, but with her hospitalized he was in a position to force the issue with Operator trustee Judy, and undoubtedly felt that the end—that is, the increase in pensions—justified the means. Even if Judy refused to go along, the Union's position in subsequent bargaining would be strengthened. Thus, Boyle decided to see if he could bully it through. As soon as he was designated trustee, Boyle called a meeting of the trustees for the next day at his offices at the Union.

Judy approved the increase in a private session with Boyle immediately before the formal meeting, under circumstances which will be mentioned later. The increase was formally approved a few minutes later and an announcement was thereafter sent out over Boyle's name to all pensioners and potential beneficiaries.

This action was taken in unnecessary haste. The trustees did not adequately consider the implications of their action, and while the increase was not wholly irresponsible it was not approached with adequate regard for the trustees' fiduciary obligations. Roche was not consulted or even advised of the action in advance, and in fact continued vigorously to oppose the pension increase. No detailed projections of the Fund's long-term ability to pay were made, nor were possible alternative changes in benefit payments considered.[13] The trustees took no contemporaneous steps partially to offset the added payout by eliminating unnecessary administrative expenses or by investing cash in income-produc-

12. Joseph Yablonski had announced his candidacy on May 29, 1969. Boyle had relieved him of his position with the Union's Nonpartisan League on June 9.

13. The range of alternative increases in benefits was indicated by Ryan in a report to the Union's Executive Board on March 14, 1968. Besides a pension hike, Ryan noted that the following changes were among those being urged on the trustees: broadening eligibility for pensions to include totally disabled miners with ten years' service, regardless of age; making miners' widows eligible for medical care benefits until the age of 65; providing additional medical benefits for incapacitated children of miners; paying Medicare premium for beneficiaries over the age of 65; extending benefits for unemployed or disabled miners; and increasing widows' and survivors' benefits. According to Ryan's estimates, the additional cost of these modifications would eventually amount to over $35 million annually.

ing securities. In short, the increase was handled as an arrangement between labor and management with little recognition of its fiscal and fiduciary aspects.

Prior to June 24, Judy had never attended a meeting of the trustees except for the pro forma session at Lewis' home earlier that month. He was president of the BCOA and well familiar with the negative attitudes of some operators towards higher benefits. He had some general knowledge of the Fund's fiscal position. Before he entered the meeting he had been warned by the Association's lawyer that matters of substance might be raised by Boyle, and it had been suggested he not act without further consultation. He failed to call Roche for her views or to question Boyle as to his representations, and after making some hasty mental calculations proceeded on the basis of his own generally favorable attitude. At the trial he took the position that money to support a pension increase was available, that the miners deserved the increase, and that he approved of it on the merits. He testified that he had no obligation to consult the operators, pointing out that his predecessor had never consulted them.

After the action had been taken, however, he was called on the carpet by the operators, some of whom violently opposed the pension increase. He made little, if any, effort to justify his action on the merits. He rather argued that he had simply been placed in an impossible position at the meeting because Boyle had advised him that he, Boyle, had Roche's proxy and that the neutral trustee was in Boyle's pocket.

Thus two explanations are suggested for Judy's conduct: that he voted to increase pensions because he believed it was the correct thing to do, and that he voted for the increase because he was led to believe Boyle and Roche were for it.

 While Judy undoubtedly felt that the miners needed a pension increase and that there was money available to pay it, this was not solely why he acted.

Judy would not have voted for the increased pensions at the June 24 meeting on the spur of the moment, without advance warning, against the advice of counsel, knowing that the royalty payments of the coal operators might be affected, if he had not been falsely led to believe by Boyle that Boyle had Roche's proxy. It was a serious error of judgment for Judy to have accepted Boyle's representations and for Judy not to have checked with Roche, at least by telephone. While Judy was forced to resign under pressure a few days later when the operators learned that Boyle did not have Roche's proxy, and while he was but a passing participant, his conduct fell below the standard of care and skill required of a trustee. He acted hastily and without taking the normal precautions requisite for responsible fiduciary actions.

 Boyle of course also proceeded without regard to his fiduciary obligations in pushing through the pension increase. He failed even to notify the neutral trustee of the meeting or of the contemplated pension increase, which was itself in neglect of the duty of a co-trustee. See Wilmington Trust Co. v. Coulter, 41 Del.Ch. 548, 200 A.2d 441, 451 (1964); Bogert, Trusts & Trustees § 554 (2d ed. 1960). He brought about the action by a hasty power play, fortifying his position by falsely indicating that Roche supported his proposal. Unlike Judy, Boyle remains a trustee. It has been shown by testimony and by Boyle's demeanor at the trial that he considers the Fund in effect the property of the Union to be used in whatever manner the immediate and long-term objectives of the Union warrant. As Boyle's conduct in this instance demonstrates, such compulsions of militant Union leadership are inconsistent with the dictates of prudent trusteeship.

The most revealing document in this entire episode is the full text of the press release which the Fund's public relations man issued on the day of the pension increase. It reads as follows:

Washington, D. C. ——W. A. "Tony" Boyle, President of the United Mine

Workers of America, succeeded John L. Lewis today as the Chief Executive Officer and Trustee of the Union's Welfare and Retirement Fund, and immediately boosted the pension of retired soft coal miners from $115 to $150 monthly.

The new pension rate will be effective August 1. It was voted at the first session of the Trustees attended by the Union chief. He was chosen trustee at a meeting of the International Executive Board yesterday, and as chief executive officer of the Fund, as set forth under the UMWA contract with the bituminous coal industry, called a meeting of the trustees, and the pension boost was adopted. Other trustees are George Judy, for the coal operators, and Josephine Roche, also director of the Fund, as the neutral.

Pensions now are going to approximately 70,000 retired soft coal miners. Last year, the Fund paid out $96 million in this benefit alone. Other benefits are complete hospital care for miners and their families, and death benefits to widows and survivors.

Chairman Boyle also called for an immediate in-depth study of all benefits of the 23 year-old-Fund, with complete analysis of the entire program for miners, their widows and families. He has received scores of suggestions for possibly improving the benefits at a series of rallies in the coal fields of West Virginia, Pennsylvania and Illinois in recent months.

The new chief executive of the Fund, like his predecessor, will accept no pay for serving as Trustee.

Nothing could more blatantly expose the realities of what had occurred in this instance and had been occurring for some time. However correct or incorrect the pension increase decision may have been, it reflected the Union's influence over Fund policy and the loss of independence that the Fund's continuous deferences to the Union's self-interest had by this time achieved.

## IV

## THE INDIVIDUAL DEFENDANTS

■ Before considering the involvement of each of the named individual defendants, a brief statement of the applicable legal standards is required. The elements of conspiracy or participation in breach of trust discussed earlier with respect to the Union and the Bank are equally applicable to the individual defendants. An officer of a corporation or other entity found to have participated in a breach of trust is not liable simply by reason of his officership, but an officer is liable if he personally knows of the breach of trust and participates therein or fails to take action to correct it. See Strauss v. United States Fidelity & Guaranty Co., 63 F.2d 174 (4th Cir. 1933); 4 Scott on Trusts § 326.3 (3d ed. 1967). It is not necessary to prove that the individual personally profited from the transaction. And one who knowingly joins a conspiracy "even at a later date takes the conspiracy as he finds it, with or without knowledge of what has gone on before." Myzel v. Fields, 386 F.2d 718, 738 n. 12 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S. Ct. 1043, 19 L.Ed.2d 1143 (1968).

■ *Josephine Roche.* Roche had a distinguished public career before joining the Fund, and she has played a unique role in the affairs of the Fund since its inception. She has been both the neutral trustee and the Administrator, a full-time salaried position. While she has had a long interest and commitment to the welfare objectives of the Fund and has contributed substantially to many of its unique welfare successes, her business experience was more limited. She did not profit personally in any way by any of the actions taken. She idolized John L. Lewis and felt entirely confident to follow his leadership in financial matters, apparently without independent inquiry. She was an active participant in each breach of trust except the pension increase. Indeed, without her affirmative approval they probably would not have occurred. She ac-

cepted without question the accumulations of excessive cash at the Union's Bank even when the propriety of depositing these balances was raised at trustee meetings, and in the face of advice that the cash could be invested without impairing the liquidity of the Fund. Perhaps she failed wholly to recognize the full implications of her actions, but naiveté and inattention cannot excuse her conduct. She violated her duty as trustee in all the respects previously discussed, and she must be said to have knowingly furthered the conspiracies as to the cash and the utility company investments.

*W. A. (Tony) Boyle*: Boyle was not a party to the original conspiracy, and never adopted its ends. He was not responsible for the accumulation of excessive cash at the Bank, although he knew about it. From the moment he became President of the Union in 1963, and indeed earlier, he sought to persuade Lewis to have the Fund pay out larger benefits, which would have had the effect of reducing cash balances. Boyle also insisted that various loans and other financial involvements engineered on behalf of the Union by Lewis in cooperation with the Fund and the Bank be terminated, and this was done. This did not disentangle the Union from the conspiracy as to the cash balances, but it is action inconsistent with individual participation by Boyle in any conspiracy. The failure of the Union to supplant Lewis after Boyle became president cannot, on the evidence before the Court, be considered sufficient to hold Boyle as an individual conspirator although the agreement was renegotiated after 1963 and Lewis could have been removed.

Boyle, however, violated his duty as trustee in several particulars. His actions in forcing through the pension increase, partly be misrepresentation, in haste and without consulting the neutral trustee, reflect an insensitivity to fiduciary standards. In addition, he continued to serve as director of the Bank and member of its Executive Committee after becoming trustee, a relationship which conflicted with that degree of independence required of a trustee under the circumstances of this case. He took only limited action to modify the inappropriate application forms that encouraged improper cash levies by the Union on applicants as a condition precedent to receiving pension benefits.

*George L. Judy*: Judy is guilty of poor judgment but not of conduct that violated his duty as trustee. He should have consulted the independent trustee before acting hastily at Boyle's insistence and without adequate information in approving a pension increase which had substantial effect upon the long-term operations of the Fund. No relief is required as to Judy, since he is no longer a trustee and there is no likelihood he will be one in the future. He was a trustee for only six weeks, and did not participate in any conspiracy. The case as to him is dismissed.

*Barnum L. Colton*: Colton was a party to the original conspiratorial agreement to place excessive cash in the Bank, and as the chief executive of the Bank he participated in carrying out that breach of trust. His collaboration with the Union was far more than that which followed merely from his office.

*C. W. Davis*: Davis, the trustee representative of the Operators, is a nominal defendant named to assure proper implementation of any equitable relief against the Fund. He is not shown to have engaged in any improper conduct. All the events here reviewed occurred prior to his designation as trustee.

## V

### RELIEF

All defendants contend that the doctrine of laches bars any relief for the claimed breaches of trust, and alternatively that the statute of limitations bars any claim for damages by reason of events occurring more than three years prior to the filing of this suit. Plaintiffs assert that laches, not the statute of limitations, is applicable to all causes of action herein, and urge that they have not been guilty of any unreasonable delay which would bar relief.

It is clear that an action to redress a breach of trust sounds in equity, and that the statute of limitations is inapplicable to such a suit in the District of Columbia. *See* Naselli v. Millholland, 88 App.D.C. 237, 188 F.2d 1005 (1951); Haliday v. Haliday, 56 App.D.C. 179, 11 F.2d 565, 569 (1926); Nedd v. Thomas, 316 F.Supp. 74, 77 (M.D.Pa.1970); 3 Scott on Trusts § 219 (3d ed. 1967). Nor is the statute of limitations strictly applicable to the cause of action against the Union or the Bank, for it is the breach of trust they conspired to carry out, not the conspiracy itself, which is the gist of the action. See cases cited page 1099 *supra;* Restatement of Trusts 2d § 327(a), Comment k. It is true that courts customarily follow the statute of limitations even in equity cases where essentially legal relief, such as damages or an accounting, is sought. Columbian University v. Taylor, 25 App.D.C. 124, 131 (1905). This rule, however, is not strictly followed in this jurisdiction. Haliday v. Haliday, *supra,* 56 App. D.C. 179, 11 F.2d 565, 569 (1926). The guiding principle is that "laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced * * *." Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).

The Court is mindful of several factors which bear upon the equity of awarding damages for the excessive cash accumulations at the Bank going back to 1950. The actual size of the deposits was never concealed, but was regularly reported in the annual reports of the Fund which were widely distributed. The relationships of the Union and the Fund with the Bank were mentioned on numerous occasions in the Mine Workers Journal and elsewhere. Certainly by reasonable diligence most, though not all, of the relevant facts as to the cash deposits could have been readily ascertained. The delay has prejudiced the defendants in that some of the major participants in these events are now dead, and if damages were assessed for the Fund's loss of investment income over the full twenty years, both the Union and the Bank, whose resources will necessarily feel the major impact of the judgment, would be seriously injured. In assessing the reasonableness of the delay, however, the Court must consider the impecunious nature of the beneficiaries, the obstacles of Union discipline which could well have intervened, the fact that the class of beneficiaries was continually changing, and the fact that as late as May, 1969, the Fund through a statement in the Union newspaper disingenuously represented that the large cash balances were necessary for the operation of the Fund. Thus the delay is not inexcusable, but it must be taken into account in determining the period for which damages will be assessed.

Moreover, the Court notes that while the beneficiaries have suffered as a result of the Fund's loss of investment income, they have benefited to some extent from the Union's activities over the past twenty years. In the longer view of matters, the Union's strength protects the interests of the beneficiaries, past and prospective; the Union should not be weakened to a point where its stance at the bargaining table will be substantially impaired.

Balancing these factors, and recognizing the similarity between this action in equity and one at law for damages, the Court will adopt the three-year limitation provided by 12 D.C.Code § 301(8) as to the damages aspect of this case.

No considerations of equity intervene to bar prospective remedies for mismanagement of the Fund by its trustees. The Fund has been seriously compromised. It has failed to develop a coherent investment policy geared to immediate or long-term goals. It has collaborated with the Union contrary to the trustees' fiduciary duties, and has left excessive sums of money on deposit with the Union's Bank in order to assist the Union. In their day-to-day decisions, the trustees have overlooked their exclusive obligation to the beneficiaries by

improperly aiding the Union to collect back dues and by cutting off certain beneficiaries unfairly.

Alongside these serious deficiencies must be placed the pioneer role of the Fund, which by constant effort has led in the development of a broad program of welfare benefits for a distressed segment of the working population. The many beneficial and well-motivated actions cannot, however, excuse the serious lapses which have resulted in obvious detriments to many beneficiaries. There is an urgent need for reformation of policies and practices which only changes in the composition of the Board of Trustees, an adjustment of its banking relationship, and other equitable relief can accomplish.

Further proceedings must be conducted on the measure of damages, but as the Court indicated before trial it is desirable at this stage to establish the nature of equitable relief which must be taken for the protection of the beneficiaries. Equitable relief shall take the following form.

Neither Boyle nor Roche shall continue to serve as a trustee. Each shall be replaced by June 30, 1971, under the following procedures. A new trustee must first be named by the Union. Consonant with the provisions of the Agreement, the new Union trustee and the existing trustee representing the Operators shall then select a new neutral trustee. The neutral trustee shall be designated on or before June 15, 1971, and the designation will then be submitted for approval by this Court before the new trustee takes office on June 30.

The newly constituted Board of Trustees selected as required by the decree shall then immediately determine whether or not Roche shall continue as Administrator of the Fund. No trustee shall serve as Administrator after June 30, 1971.

Upon the selection of a replacement for Boyle and the neutral trustee, the newly constituted Board of Trustees shall be required to obtain independent professional advice to assist them in developing an investment policy for creating maximum income consistent with the prudent investment of the Fund's assets, and such a program shall be promptly put into effect.

The Fund shall by June 30, 1971, cease maintaining banking accounts with or doing any further business of any kind with the National Bank of Washington. Following termination of this relationship, the Fund shall not have any account in a bank in which either the Union, any coal operator or any trustee has controlling or substantial stock interest. No employee, representative or trustee of the Fund shall have any official connection with the bank or banks used by the Fund after June 30, 1971. The Fund shall not maintain non-interest-bearing accounts in any bank or other depository which are in excess of the amount reasonably necessary to cover immediate administrative expenses and to pay required taxes and benefits on a current basis.

A general injunction shall be framed enjoining the trustees from the practices here found to be breaches of trust and generally prohibiting the trustees from operating the Fund in a manner designed in whole or in part to afford collateral advantages to the Union or the operators.

Counsel are directed to confer and prepare a proposed form of decree carrying out the equitable relief here specified. This proposed decree shall be presented to the Court and any disagreements as to form settled on May 13, 1971, at 4:00 p. m. On May 21, 1971, plaintiffs shall furnish the Court and defendants with a precise statement of the amounts of compensatory damages and attorneys' fees and expenses claimed in light of this Opinion, a statement of the method used to compute the claims, and a list of witnesses to be called at the damages phase of this proceeding. No punitive damages will be awarded. A hearing as to compensatory damages is set for June 21, 1971, at 9:30 a. m.

# 1114

C.A. 2186-69 EXHIBIT A

plaintiffs' exhibit no. 1626b

**UMWA WELFARE & RETIREMENT FUND**

*INVESTMENT HISTORY*

[A4256]

C.A. 2186-69 EXHIBIT B

# CASH IN CHECKING ACCOUNTS AT
# NATIONAL BANK OF WASHINGTON